Mayor and Aldermen of Savannah, &c. vs. The State of Georgia, &c.

No. 3.—The MAYOR AND ALDERMEN of the City of Savannah, &c. and the COMMISSIONERS OF PILOTAGE for the bar of Tybee and the River Savannah, plaintiffs in error, vs. The STATE, ex relatione THOMAS GREEN et al. Defendants.

[1.] The Constitution of Georgia, 1st Art. and 17th Sec., declares, that no Bill or Ordinance shall pass, containing any matter, different from what is expressed in the title thereof. *Held*, that under this clause, so much of the Statute *only*, as contains matter different from what is expressed in the title thereof, will be void.

[2.] It is competent for a State Government, to authorize the construction of wharves on navigable streams, within its Territorial limits, even below low water mark; and the exercise of this power will not be deemed unconstitutional, because of its repugnancy to the power of Congress to regulate commerce— such power not having been exercised, so as to affect the question before the Court.

[3.] To justify the Court in refusing the writ of *Mandamus*, on the ground that the party applying had slept on his rights—the *laches* must be gross—the delay unreasonable.

[4.] At common law, the writ of *Mandamus* is not a writ of *Right*, but is within the discretion of the Court. Whether it be so in this State, Quere ? It will never, however, be refused, when the right is indisputable and especially *statutory*, and there is no other remedy to enforce it.

[5.] The Act of the Legislature of 1841, requiring the Mayor and Aldermen of the City of Savannah, the Commissioners of Pilotage for the bar of Tybee and River Savannah, and the proprietors and owners of wharves and lands on the shore of Hutchinson's Island, to appoint Commissioners to determine the proper line of wharf-heads along the shore of said Island, is *mandatory* in its language, and not *permissive* merely; and the service therein enjoined, not being foreign to the official duties of the appointees, its performance is obligatory on them; and it is no sufficient excuse for their refusal, that in their own opinion or that of others, it will injure the navigation of the River Savannah, the commerce of the City and the public generally.

Application for a Mandamus before Judge Fleming, in Chatham county, July, 1847.

By an Act of the Legislature of Georgia in 1841,—"*to make permanent the water-line, for certain wharves, on the shore of Hutchinson's Island in the Savannah River, opposite the City of Savannah; and for appointing Commissioners to carry the same into effect,*" a commission was established, "to consist of *four* persons to be chosen and appointed by the Mayor and Aldermen of the City of Savannah; *three* to be selected by the Commissioners of

Pilotage, for the bar of Tybee and River Savannah; and *six* by the proprietors and owners of wharves and lands on the shore of Hutchinson's Island." The parties authorized to select commissioners, were "*required forthwith to perform said duty ;*" and the Commissioners, so appointed, after giving notice, "*shall on the day so assigned and fixed, proceed to perform the duties and office herein required by this Act.*" And by a subsequent section, the commissioners were required to lay off said line, according to a line designated on a map, referred to by the Act. (The provisions of this Act are minutely set out in the opinion of the Court.)

On the first day of July 1845, an information, the State ex relatione Thomas Green and others, proprietors and owners of lands, &c., on Hutchinson's Island, was filed, praying of the Judge of the Superior Court of Chatham county, a Mandamus, to compel the Mayor and Aldermen of the City of Savannah, and the Commissioners of Pilotage, &c., to execute the trust conferred by said Act, by appointing Commissioners. An order was granted, requiring them to shew cause on the ninth day of July 1845, why the Mandamus should not be granted; on which day, after hearing their return, and argument, Hon. C. S. Henry, then presiding, granted an alternative Mandamus, returnable to the January Term of the Superior Court of said county, 1846.

At the January Term, 1846, the defendants (plaintiffs in error) filed their return to the alternative Mandamus, under oath, and for cause why the same should not be made absolute, showed :

1st. That they have not in any manner accepted the power, agency or trust, which is conferred upon them, or attempted to be conferred upon them, by the Act of the Legislature, passed 10th Dec. 1841, and cannot, as they are advised, legally be compelled to accept the same.

2d. That the said Act is merely permissive, and not compulsory; that there is nothing in the language, or terms of said Act, which is mandatory, or which requires them to accept or perform the duty therein required, contrary to their will and consent.

3d. That the duty required of them, to be performed; doth not legally appertain to their office or duty, as the Mayor and Aldermen of the City of Savannah and the Hamlets thereof, and if discharged, it would, as they are advised and believe, be of irreparable mischief and injury, to the navigation of the River Sa-

**28**        **SUPREME COURT OF GEORGIA.**

Mayor and Aldermen of Savannah, &c. *vs.* The State of Georgia, &c.

vannah, and commerce thereof, and the public generally, who are interested therein.

4th. That the said writ ought not to be made absolute against them, because the said relators have been guilty of gross laches, in sleeping upon their rights, if ever any they had, since the passing of said Act, and up to the issuing of said writ, and are therefore not entitled to any aid from this Court, in enforcing their rights, if any they have.

5th. Because in a doubtful case of right, as they are advised, a Court of Law will never interfere by its writ of Mandamus.

An issue of fact was formed, upon that portion of the 3d ground, relative to the injury that would accrue to the navigation of Savannah River, and the commerce thereof, and the public generally; and at the January Term 1847, a verdict was rendered by a special jury, in favor of the Respondents.

There was evidence in the Bill of Exceptions to show, that the reason of the delay on the part of the Relators, was the loss of the map referred to in the Act. Afterwards, on the 20th July, 1847, His Honor, Judge Fleming, after hearing argument on the questions of law, made by the return of the Respondents, delivered a written opinion, by which, after carefully examining the points urged by the Respondents, he ordered the Mandamus to be made Absolute.

To which decision, exceptions were filed by the plaintiffs in error, and upon those exceptions, error has been here assigned.

WM. & WM. F. LAW and JOHN E. WARD, for plaintiffs in error, submitted the following points and authorities:

The Plaintiffs in Error will respectfully contend that the Writ of Mandamus, which has been ordered by his Honor Judge Fleming to be issued against them, ought not to be issued.

1st. Because the Writ of Mandamus, being a high prerogative Writ, will only be issued to an Inferior Court of Judicature, or to a Corporation, requiring them to do some particular act or thing therein specified, which legally appertains to their duty and office to perform. 3 *Blackstone*, 110, (85.) 2 *Selwyn's Nisi Prius*, 1093, *Angel & Ames on Corporations*, 556, 557, 574, 571, 572, 584. 5 *Peters*, 192. 1 *Chitty's Practice*, 990, 791, 796.

Mayor and Aldermen of Savannah, &c. *vs.* The State of Georgia, &c.

And we respectfully contend, that the duty we are called upon to perform, is not the legal duty of the Plaintiffs in Error. *Clayton's Digest*, 32, 33, 88, 140, 141, 532, 533, 425, 453. *Dawson's Digest*, 479, 480.

The Act of 1841, by its terms, gives to the Plaintiffs in Error a *right*. It confers an authority, but imposes no obligation, and is a mere trust, which the Plaintiffs in Error may or may not accept. *Pamphlet Laws of* 1841, *p.* 47. 2 *Story's Equity*, 427.

2d. Because the Writ of Mandamus is not a Writ of Right, but is discretionary with the Court, which discretion ought to be governed by the facts in each particular case, and in this case ought to have been controlled by the ascertained and acknowledged fact that the navigation of the River Savannah, the commerce thereof, and the public generally, if the line should be run according to the provisions of the Act of December 10, 1841, would be injured. 4 *Bac. Ab.*, 515. 1 *Cowen*, 522. 8 *Peters*, 291, 302. 3 *Kent*, 432, *(note a.)* 1 *Chitty's Practice*, 791.

3d. Because the rights of the Defendants in Error, if any they ever had under the Act of December 10th, 1841, have been lost by their laches and neglect. 1 *Chitty's Practice*, 791. 1 *Maule & Selwyn*, 32. 2 , *Wendell*, 269.

4th. Because the Act of the Legislature, assented to on the tenth day of December, 1841, contains matter different from what is expressed in the title thereof, and is therefore unconstitutional and void. *Pam. Laws of* 1841, *pp.* 47, 50. *Hotchkiss' Digest*, 59.

5th. Because, by the line designated to be run in the said Act, a part of a navigable stream is granted to private individuals, and the Act is therefore unconstitutional and void. *Hotchkiss' Digest*, 47. 9 *Wheaton*, 197, 208, 209.

Robert M. Charlton, for Defendants in Error.

1. The first exception of the Plaintiffs in Error refers to that part of the decision of the Court below, which holds that the language of the act of 1841 is compulsory upon, and not permissive to the plaintiffs in error. The plain language of the act ought to settle this question—the plaintiffs in error are "*required* forthwith" to appoint the Commissioners on their part. Unless the meaning of words is to be changed to suit the purposes of the plaintiffs in error, this is rather too *compulsory* a *permission* to

shelter the plaintiffs in error from a compliance with the orders of the superior authority of the Legislature. *The King vs. The Bristol Dock Company,* 13 *Eng. Com. Law Rep.* 139. *Angel and Ames on Corporations, p.* 574.

2. The second exception refers to that part of the decision, which declares that it was not necessary for the plaintiffs in error to accept this trust, as it is called, for that it appertained to their official duty to perform it.

I might answer this objection, so far as the Commissioners of Pilotage are concerned, by saying, that if an acceptance was necessary, they did accept the "trust"—it was at their request that this act was passed. What higher evidence of their assent to its obligations could be given? But I choose to take other grounds. I say, then, that if a person assumes an office of a public character, he is bound to perform all the duties which the proper authority may impose upon him, as well those duties which have been already prescribed, as those that may subsequently be attached—even in the case of a ministerial office, which involves in it some idea of a contract, this is true. *The State vs. Dews, R. M. Charlton's Rep.* 397. See particularly p. 404, 405, 408. *Andrews vs. U. States,* 2 *Story's Rep.* 202. How much more in the case of an office like that of the plaintiffs in error, which is or ought to be undertaken for the public good, as it may be ascertained by the proper authority. Shall no duty be required of them, if it was not required of them, when they assumed the office? It was not necessary, therefore, that they should signify their acceptance of this particular duty. By accepting the offices of Alderman and Commissioner of Pilotage, they bound themselves to perform this and any other appropriate duties that might be required of them by the Legislature.

The only question is, can this be considered a part of the official duty of the plaintiffs in error; for I admit, that even the *Legislature* could not compel them to do any thing which was not within the line of their duty? But I apprehend that the Legislature have made no such unjust requisition here.

First, as to the Mayor and Aldermen. I refer to the following statutes to shew that this duty was appropriate to them. Act of 1825, *(Dawson's Compilation, p.* 464, *sec.* 5,*)* which authorises them to elect Harbor-Master, Commissioners of Pilotage, and all other officers that may be necessary for the police or good government

of the Harbor and River Savannah—*sec.* 6, to enforce all quarantine laws, and to abate all nuisances within the limits of the corporation—*sec.* 9, to remove all encroachments by wharves on the River Savannah—*Act of* 1838, *pamp. p.* 63, *sec.* 2, extending the corporate limits and authority over the waters of Savannah River, and the land covered by said waters which lie south of Hutchinson's Island. A number of other acts might be adduced to shew that to the Mayor and Aldermen of the City of Savannah are entrusted the care of the city and the river, and of choosing officers to superintend and protect the interests of the citizens in this regard; and, as his Honor properly remarks, the objects of this law were of deep interest to the citizens, and the welfare of the city. The act, therefore, only required of them to perform a duty, which, by the acceptance of the office itself, they had bound themselves to perform.

And the same remark applies to the Commissioners of Pilotage. The act of 1815, *(Lamar's Dig. p.* 678,*)* invests the Commissioners with full power to regulate the Bar and River Savannah. By the act of 1807, *(Clayton's Dig., p.* 425,) they are also appointed the Guardians of the River; and this is confirmed by the act of 1828, *(Dawson's Comp.* 479,*)* and many other acts might be referred to, to show that the acts, enjoined and required by the Statute of 1841 of the Commissioners of Pilotage, were strictly within the line of their official duty.

3. The third exception refers to the opinion of the Court, which declares that the act should be enforced, despite of the verdict of the Jury, declaring that its observance would be of injury to the navigation of the River. The Court was correct in disregarding the verdict, because it was an issue that ought never to have been submitted. The act had declared that this line should be run for the purpose of improving the commerce and navigation of the River Savannah. It had been passed at the instance of the Guardians of the River, but when they had obtained its passage, they refused to obey it, upon the ground that it would injure the River. But were they not bound to obey it? Are not the will and authority of the Legislature supreme within the constitutional limits? Can an individual, or inferior corporation, arrest the operation of a law, whenever by his or its judgment or opinion it ought not to be enforced? Shall a Court submit to a jury whether a statute of the State shall be enforced or set aside? These inferior corporations would

not allow their own ordinances and rules to be thus disposed of, and shall they dare to treat the orders and laws of their superior with such disrespect? What has the Court to do with the wisdom or folly of a law? *Ita lex scripta est* must be its rule and its argument.

4. The fourth exception refers to the imputed *laches* of defendants in error in carrying the law into effect. The evidence shows, that the map which formed a part of the act, and without which nothing could be done, was lost shortly after the passage of the act, without any fault imputable to our clients. As soon as it was found, they sought to enforce it. Unless we are made to suffer for the wrong of another, this argument cannot avail our opponents.

The authorities say, that the application for mandamus must be made within a reasonable time after the *grievance* has been committed. And the cases cited shew a very great laches. *The King vs. Stainforth Canal Co.* 1 *Maule & Selwyn, p.* 32. *The King vs. the Cockermouth Co.* 20 *Eng. Com. Law Reports,* (1 *Barn. & Adol.* 378,) 403. There was no grievance, in this sense, committed against us until after the map was found; before that, it was impossible to proceed; and as soon as it was found, and the plaintiffs in error refused to appoint their Commissioners, this proceeding was commenced.

5. The fifth exception complains that the right of our clients was a private and doubtful right, and one that a mandamus should not issue to enforce, and yet that the Court has enforced it. To this, we have several answers. 1. That the object of establishing this line is to reconcile conflicting interests, and thus preventing litigation, and also to improve the commerce and navigation of the River Savannah. These surely are public purposes. 2. The persons who refuse to carry out the law are public officers; and for private rights, withheld by public officers, the writ may well be issued. 1 *Chitty's Gen. Prac.* 790. 1 *Term Rep.* 146. *Idem,* 374. *Strange,* 512. *Forsyth vs. The Justices, &c. Dudley's Rep.* 37. 3. It is substantially a remedy for the subject, and the King's name is only nominally used. 3 *Stephen's Nis. Pri.* 2291. 4. That mandamus lies in all cases where the party hath a right to have any thing done, and hath no other specific means of compelling its performance. 3 *Black. Com.* 110. 5. That whenever a statute directs something to be done, the Court will compel its performance. 3 *Stephens' Nis. Prius,* 2292, 2294. *Ex parte Lynch,*

2 *Hill's N. Y. Rep.* 46.   *Marbury vs. Madison,* 1 *Cranch,* 168, 173.   *Hull vs. Supervisors of Oneida,* 19 *John. Rep.* 262.

If these authorities are correct, we are entitled to the mandamus, for the duty was that of a public officer, and the right not a doubtful one, but one enforced by a public statute, and as well for beneficial public purposes as for a private right withheld.

All that it was necessary for us to show, was that we had a legal right, and no specific legal remedy.   The statute gives us a legal right—it establishes our line, and gives us up to that line to prevent conflicting claims.   (In section 2d, it calls the line, "the legal line, of the wharf heads.")   Have we not a right to have the line ascertained and defined, especially as we may be punished for going beyond it?   It declares that for these encroachments, the wharf up to the line may be sold as our property.   The Legislature have certainly the power to grant this line to us, even if it should cover a public stream, and they have so granted to us, and we have no other remedy to enforce our rights.

It may be true, that since Magna Charta, the *King* cannot extinguish the *jus publicum* in a navigable river; although even this may be doubted.  .See *Thompson J. dissenting opinion,* 16 *Peters' S. C. Rep.* 425, *and see C. J. Taney,* 410.

But the right of Parliament has never been disputed: *Rex vs. Montague,* 4 *Barn. & Cress.* 598.   *Angel on Tide Waters, (2d edit.) p.* 85.

And the States of this Union certainly have the power within proper limits : *Angel on Tide Waters, p.* 87, 88, 106-7, 123, *note ;* 131, 307.   *Commonwealth vs. Charlestown,* 1 *Pick.* 180.   *Charlestown vs. County Commissioners,* 3 *Metcalf,* 202.   *Commonwealth vs. Breed,* 4 *Pick.* 460.

And this power may be delegated to persons or corporations : *Angel on Tide Waters,* 91, 92.   7 *Pick.* 207.

But this question does not properly arise in this case, as no such exception was taken to the decision of the Court.

If any statute, passed by the last Legislature, affecting this case, should be referred to, we affirm that this Court can take no cognizance of it.   It cannot reverse the decision of the Judge below for error, because of a *subsequent* statute; it is limited to the exceptions taken at the time of decision; and, indeed, any statute which would seek to divest our vested rights in reference to this line would be void: *(1 Kelly's Rep.* 608, '9*)*   "Vested rights are held by jurists every where to be irrevocable, and with which

neither the *Judiciary* nor the *Legislature* can interfere : 2 *Kelly* 232. 1 *Kent's Commentaries, (3d edition,)* 455, *and cases cited in note (d.)*

*By the Court.*—LUMPKIN, J., delivering the opinion.

In 1841, the Legislature of Georgia passed an act " to make permanent the water line for certain wharves on the shore of Hutchinson's Island in the Savannah River, opposite the city of Savannah ; and for appointing commissioners to carry the same into effect."—*Pam. Acts of* 1841, *p.* 47.

*Sec. 1st* Declares, " that for the purpose of adjusting the various conflicting interests of the owners of land along the shores of Hutchinson's Island, and for the improvement of the navigation of the River Savannah, that a line of wharf heads should be permanently established on the shores of said Island."

*Sec. 2d* Provides, that the line of wharf heads should commence " at a point opposite the mouth of the Ogechee Canal, and end nearly opposite the eastern extremity of the city, which would embrace the interest of all concerned." It established a commission to carry out this object, " to consist of four persons, to be chosen and appointed by the Mayor and Aldermen of the city of Savannah ; three to be selected by the Commissioners of Pilotage for the bar of Tybee and River Savannah ; and six by the proprietors and owners of wharves and lands on the shore of Hutchinson's Island ;" a majority of the whole number of thirteen were to establish the line of wharf-heads and water-lots, authorized by the act ; and said line when run, was declared to be the true and legal line of wharf-heads of the water-lots on the shore aforesaid, beyond which there should be no encroachment under a penalty of one thousand dollars for every foot of encroachment beyond it, to be recovered at the instance of the Commissioners of Pilotage for the bar of Tybee and River Savannah ; and further, they were required and empowered to cause such encroachments to be removed at the cost and expense of the owner of the wharf-lot, from which it was made ; and the same might be recovered by *distress* and sale of such wharf-lot and improvements, or of any other property belonging to the owner thereof.

*Sec. 3d* Enacts, " that the parties therein authorized to choose and appoint Commissioners for the purposes designated, *are requir-*

*ed forthwith to perform said duty;* and either party may, after giving the other parties interested notice of such appointment having been made, assign and fix a day, not exceeding twenty days after the date of said notice, when they shall proceed to execute the trust conferred upon them by the act; *shall on the day so assigned and fixed, proceed to perform the duties and* office herein required by this act."

*Sec.* 4*th* Provides, "no rafts of timber, lumber, wood, staves, shingles, reeds, or any other material, shall be permitted to remain moored in the river beyond the said water-line more than three days at any one time, under a penalty of five hundred dollars, to be recovered at the instance of the Commissioners of Pilotage aforesaid, who are hereby authorized to detain said raft until good security be given for the payment of the eventual condemnation penalty." This restriction was not to be so construed as to prevent vessels from mooring lumber along-side for the purpose of loading.

*Sec.* 5*th* Makes it "the duty of the Commissioners to cause to be erected and fixed at the points of commencement and termination of said line, a post or pillar of some durable and imperishable material;" and it has further prescribed "that they cause to be ascertained by accurate measurement the distance between said pillars, and also the respective bearings and distances of said posts or pillars from some natural object in the vicinity, so as accurately to designate the spots on which such posts or pillars should be in case of loss or removal." They were to cause to be made also, a map or plat of said line, showing the points of commencement and termination of said line, the bearings and course of said line, the distance between said posts or pillars, and also the respective bearings and distances of said posts or pillars from such natural objects in their vicinity; and they were to have the same accurately copied and recorded in the Mayor's Office in the City of Savannah, and in the Office of the Secretary of State.

*Sec.* 6*th* Provides, "that the expenses of said survey and of said Commissioners, shall be paid, one half by the Commissioners of Pilotage, and one half by the owners of the water-lots along said line, on the deposite of one certified copy in the Mayor's Office in the city of Savannah, and one certified copy in the Office of the Secretary of State."

*Sec.* 7*th* Declares, "that the Commissioners created by the act,

in addition to their other duties, should determine the proper line of wharf-heads along the southern shore of the river Savannah, between certain points therein specified, and define the same under like powers as are thereby directed for the determination of the line of wharves along the shore of Hutchinson's Island;" and it says that "the provisions of said act shall apply and be in force as to the regulation of said new wharves, as well as to those established on the shores of Hutchinson's Island."

*Sec. 8th* Declares, "That said Commissioners be, and they were thereby required to lay off said water-lots according to a line on a map, marked 1. 2. 3. 4. 5. 6. 7. 9. 12. 14. 16. 16. 16. 16. 15. 18. 14., certified to the Legislature by the Commissioners of Pilotage of the city of Savannah, which said map, the Secretary of the Senate was required to transmit upon the passage of the said act to said Commissioners, for their information and direction."

*Sec. 9th* Repeals all laws and parts of laws militating against the act.

I have intentionally incorporated in this opinion, more of the statute, than would seem to be strictly necessary for the adjudication of the questions, made by the Bill of Exceptions. My reason for doing so was this: It was strongly insinuated, indeed, I may say, directly charged in the argument, that the passage of this act was procured by fraud, and misrepresentation.

We are not permitted to travel out of the record, in order to ascertain at whose instance this act was passed. It is proper, however, to observe, that it is not usual for the Legislature to enact a law operating so vitally on local interests, except upon the solicitation and advocacy of those members, whose constituents are to be more immediately affected by it. We cannot know, and therefore cannot say, that such was the fact in the present case. We think it may be pretty fairly inferred, from the face of the act itself, which is evidently drawn with great care and circumspection. One thing is very manifest, namely, that every precaution is taken to protect the navigation of the river from all obstructions that would impede or impair its commerce. And the severe penalties enacted against encroachments by lot owners on the Island, can hardly be supposed to have been self-inflicted by the proprietors themselves, or at their instigation.

Besides, we find attached to the map, sent up to the Legislature by the Commissioners of Pilotage, designating the line which was

adopted by the statute, a statement by that body, that the same ought to be the true boundary of the water lots to be laid out to the owners of land on the southern shore of said Island, and " *that it would conduce to the prosperity and welfare of the City of Savannah, and the inhabitants thereof, that the lots as therein described should be laid out.*"

Of course they are estopped by their deed. They are *voluntary* parties to this grant. They have accepted in advance, the trust which it devolves upon them.

But to resume the statement: the Mayor and Aldermen of the City of Savannah, and the Commissioners of Pilotage, refused to appoint Commissioners under the act as required, and an application was made by the owners of land on the Island, to compel them by *Mandamus* to perform this duty. An alternative Mandamus was granted, commanding the defendants to choose Commissioners as required by the statute, or show some sufficient excuse for their refusal. They still objected, and showed for cause—

1st. That they never accepted the trust conferred, or which was attempted to be conferred, by the act, and that they were not, as they were legally advised, obliged to do so.

2d. That the act was permissive, and not compulsory; and that there is nothing in its terms or language which is mandatory, or which compels them to accept or perform the duty therein required, contrary to their will or consent.

3d. That the duty required of them, does not legally appertain to their office; and if discharged, it would, as they are advised and believe, be of irreparable injury and mischief, to the navigation of the River Savannah, and the commerce thereof, and to the public generally, who are interested in the River.

4th. That said writ ought not to be made absolute against them, because the said relators have been guilty of gross laches, in sleeping upon their rights, if they have any, since the passage of said act, add up to the issuing of said writ, and are therefore not entitled to any aid from this court, in enforcing their rights, if any they have.

5th. Because, in a doubtful case of right, a Court of law will never, as they are advised, interfere by its writ of Mandamus.

The judgment of the Court below, being against the defendants, and a peremptory Mandamus having been awarded, an appeal for reversal is made to this court.

Two other grounds have been pressed in the argument upon our consideration. One is, that the act of 1841 is unconstitutional and void, inasmuch as it contravenes that clause of the 17th Sec. of the 1st Art. of the State Constitution, which declares "that no law or ordinance shall pass, containing any matter different from what is expressed in the title thereof."

The other point is, that the power being conferred on Congress, to regulate commerce abroad, and between the States, that all state action is *ipso facto* taken away over the navigable streams within their respective limits.

[1.] As to the objection, that the Act of 1841 is violative of the 17th Sec. 1st Art. of the Constitution of Georgia, because its title is at variance with the body of the act, I would observe that the traditionary history of this clause is, that it was inserted in the Constitution of 1798, at the instance of General James Jackson, and that its necessity was suggested by the Yazoo Act. That memorable measure of the 17th of January, 1795, as is well known, was smuggled through the Legislature, under the caption of an act "for the payment of the late State troops," and a declaration in its title, of the right of the State to the unappropriated territory thereof, "for the protection and support of its frontier settlements."

The true interpretation of this clause has become too well settled by the usage and practice of every department of the State Government, to be now disturbed. It is, that so much only of a statute is void, as contains matter different from what is expressed in the title. Such has been the uniform construction put upon this provision, by the State Courts separately, and of the Judges in Convention.

The Act of 1826, *(Prince,* 249,*)* purporting in its title to regulate *dower*, contained a provision, entitling the wife to inherit the whole estate of her deceased husband, when he died intestate, and without issue. This *Section* was declared by the Judiciary to be unconstitutional, for want of conformity to the title of the Act; it was re-enacted in 1829, *(Prince,* 253,*)* but neither the Courts nor the Legislature supposed that the invalidity of this portion of the Act of 1826, vitiated the rest of it respecting dower.

We are not disposed, therefore, to disturb a construction which seems to us fully to meet and obviate the mischief which the framers of the Constitution sought to remedy.

Had this controversy arisen under the 7th Sec. of the Act of 1841 requiring the Commissioners to determine the proper line of wharf-heads along the Southern shore of the River Savannah, it would have been clearly obnoxious to this constitutional objection; the title of the Act being "to make permanent the water line for certain wharves on the shore of Hutchinson's Island, in the Savannah River, opposite the City of Savannah; and for the appointment of Commissioners to carry the same into effect."— There is, however, no complaint with regard to this provision of the statute.

[2.] Had the Legislature the power to pass this law? The field covered by this inquiry is exceedingly broad.   We design to occupy only a small portion of it.

In England, it is conceded, that a public right of navigation, in a river or creek, may be extinguished by an Act of Parliament.— So all the Judges held in *Rex vs. Montague,* 10 *Eng. Com. Law Rep.* 413.

The old States had this power under the articles of confederation.   *Angel on Tide Waters, page* 123, *(note.)*

The States, since the adoption of the Federal Constitution, have always claimed as an attribute of sovereignty, or as a right of superintendence over their own internal policy, the right to control, regulate, and improve the navigable streams within their respective jurisdictions; the representatives of the people, the Legislature, being the sole proper judges of what was expedient in this behalf.   *Angel on Tide Waters,* 87.

I will advert to one or two State authorities, only, for here I am embarrassed, not by the scantiness, but by the superfluity of the materials which surround me.   *Inopem me copia fecit.*

This doctrine was very fully considered by the Supreme Court of Massachusetts, in *Commonwealth vs. Breed,* 4 *Pick. Rep.* 460.. And the proposition was distinctly affirmed, that an Act of the Legislature, authorizing the building of a bridge over navigable water, within the limits of the Commonwealth, is. not unconstitutional.

Morton, Justice, in delivering the opinion of the Court, says, " This power has been exercised from the commencement of our Government without objection, and in the use of it, bridges have been erected over many of the navigable rivers in the State.— Every bridge, however much care may have been taken to pro-

vide suitable drawers, has obstructed navigation in a greater or less degree; and in some instances at least, the passage of vessels of a description, which before had been accustomed to pass, *has been entirely prevented. In all cases, the Legislature has the power to inquire when the public convenience and necessity demand these partial obstructions and interruptions to navigation, and upon what terms and conditions they may be granted.*"

" But it is said," continues the Judge, "that this grant was made upon the petition, and for the sole benefit of, an individual, and was not needed for the accommodation of the public. It is doubtless true, that the leading motive of the defendant, in erecting the bridge, was private profit. And so almost all other enterprises, many of which have resulted in great public improvements, have originated in motives of private gain. We cannot on that account, see any valid objection to the constitutionality of this Act."

In *the People vs. the Rensselaer and Saratoga Rail Road Company*, 15 *Wend. Rep.* 113, the same principle was asserted, and, the Court maintained, that it was for the Legislature alone, to judge of the expediency of exercising its acknowledged power in this matter. To illustrate the extent of this reserved power in the States, Chief Justice Savage puts this case as an example : "A vessel arrives at the port of New York, from some foreign port; Congress has the exclusive power to regulate commerce and navigation with foreign nations; the vessel arrived, has sailed under the authority of the laws of Congress, but she is met at the quarantine ground, not by a bridge with a draw, which she may pass in half an hour, but by a mandate from the *State* authorities, stating, in substance, that the convenience or necessities of the people of the port, which she is approaching, require that she shall remain at quarantine one, ten, or twenty days, according to circumstances. Is such a detention unconstitutional? It has never been pretended. The contrary has been expressly adjudged." And in support of this declaration he refers to the opinion of Chief Justice Marshall in *Gibbon vs. Ogden*, 9 *Wheat.* 203.

In further support of this doctrine see 1 *Pick.* 180. 9 *Johns. R.* 507. 1 *Kent's Com.* 411. 8 *Cowen*, 146. 4 *Wend.* 9. 10 *Mass. R.* 70. 3 *Metcalf R.* 102. 12 *Con. R.* 7. 2 *N. Hamp. R.* 22. 1 *Story Com. Con.* 432. 2 *Whart. Penn.* 539.

The same question has been repeatedly presented for the determination of the Supreme and Circuit Courts of the United States. And Chief Justice Marshall, in the case of *Wilson vs. The Black Bird Creek Marsh Company*, 2 *Peters' S. C. R.* 245, says, "The measure authorized by the Act stops a navigable creek, and must be supposed to abridge the rights of those accustomed to use it. But this abridgment, unless it comes in conflict with the Constitution or laws of the United States, is an affair between the Government of Delaware and its citizens, of which the Supreme Court can take no cognizance; that if Congress had passed an Act regulating commerce in those creeks, the Court would feel no difficulty in saying, that a State law, conflicting with the law of Congress, would be void."

That the power of Congress to regulate commerce with foreign nations and among the several States, does not deprive the State government of the right of regulating internal commerce, provided such legislation does not interfere with that of the general government, I would cite 3 *Wheaton*, 337. 3 *Howard*, 212. 12 *Peters*, 91. 5 *Howard*, 504.

The right of the State to pass this Act, is conceded in the amplest terms, in a very elaborate opinion, recently delivered on his circuit, by Mr. Justice Woodbury. I refer to the case of *The United States vs. The New Bedford Bridge*, reported in 1 *Woodbury and Minot, p.* 401.

He says, "I think that the power over the public navigable streams connected with our foreign commerce and coasting trade, for the purposes of its revenue, is vested in Congress, but does not by those grants, prevent the States from continuing their former legislation over them, and especially, as to reserved objects, until it conflicts with some law passed by Congress under those grants, or some treaties made, or some express provisions of the Constitution." (p. 423.)

Again—"Because Congress has made the place a port of entry, can the State do nothing in relation to it, under the idea that the power of Congress is exclusive? Cannot the States and Cities under them also, appoint harbor masters to regulate ballast, and the place of anchorage of the foreign vessels? *Cannot they make or authorize wharves at which the vessels can unload?* or prescribe how their fires shall be extinguished, or guarded while in port, so as to prevent conflagration to the shipping or the port?"

Again—" It is not mere quarantine, or health laws, or inspection laws, or police laws, or pauper laws, or bridges and roads, or laws as to internal commerce within the State, which may be considered as reserved, and the power over them never parted with. But much as to the improvement and regulation of harbors, and vessels in port, in other respects, but not directing any thing in regard to them which conflicts with any actual legislation by Congress." (p. 429.)

Again—" This not being an obstruction by an individual without a claim of authority from the State, I feel compelled to admit, that the State herself may set up her State rights, to legislate concerning the waters where this bridge exists, (clearly within her limits,) and partially obstruct them *if she thinks it beneficial,* until her Acts conflict with some law of Congress, connected with foreign commerce, or that between the States." (p. 412.)

Forced, as we are, by the organic law, to deliver our judgments in great haste, it is gratifying to find that we are so fully sustained, by this well considered opinion of Justice Woodbury, and which was not received in time to be used in the argument.

We are not prepared then, to go in advance of the Courts of the United States, in disclaiming State jurisdiction. There is no complaint on the part of the General Government, or of any person claiming under the laws of Congress, and the State will not volunteer to repudiate its own sovereignty. Congress has not seen fit to legislate concerning this stream; and until the power, confessedly belonging to it in this behalf, shall be exercised, the mere repugnance of the law (if indeed there be such) to the power in Congress to regulate commerce, will not render it void.

In the exercise of this, as well as every other acknowledged right, the individual must act at his peril, the rule being *sic utere tuo ut alienum non lædas.* And whether the erection of these wharves will or will not injure the navigation of the river is a fact, *questio facti,* for the jury. 10 *Price,* 372, 373, 374, 378.

It may be proper to state that doubts have been entertained, and intimated, whether that can be regarded as an offence against *State Laws,* which has been done in conformity to them, and under an Act of incorporation from them; she being the best judge in all local matters, all sections and interests being represented in her public councils. If she acts injudiciously and injures the navigation of her ports, she is the principal sufferer.

We will come now to the other points presented in these pleadings; and I shall examine them irrrespective of the order in which they were made.

[3.] One of the excuses assigned by the defendants below, for not performing the duty required by the Act was,—That the parties had slept on their right, if indeed they had any. It is certainly true, that the Court will not interfere by *Mandamus*, after considerable delay on the part of the party applying for it, and especially, if other interests have sprung up, which would be affected by the proceeding. But the cases cited in support of this principle, show what is understood by the Courts as amounting to *gross laches*. In one, the applicant had slumbered from 1817 to 1829; and in the other from 1799 to 1813. *The King vs. The Stainforth and Headly Canal Company*, 1 *M. & S*. 32. *Rex vs. Commissioners of Cockermouth Inclosure Act*. 1 *Barn. & Adolp*. 378, 380, *(Engl. Com. Law Rep. XX*, 403.)

By reference to the facts embodied in the record, it does not appear that any unreasonable delay occurred in this case. The party applied for the appointment of Commissioners, so soon as the map could be found, annexed to and made a part of the Act, and without which, it was impossible for them to proceed in the discharge of their duty.

[4.] Another excuse was, that the writ of Mandamus was not a writ of *Right*, and rests in the legal and equitable discretion of the Court, to be governed by the facts and circumstances of each particular case, and in this case, ought to have been controlled by the finding of the jury; that if the line should be run, according to the Act of 1841, it would injure the navigation of the river Savannah, the commerce thereof, and the public generally.

Whether the writ of Mandamus be not a writ of Right in this State, I deem it unnecessary to determine. It is a *constitutional* writ in Georgia. By the 3d Art. and 7th Sec. of the Constitution, it is declared "that the judges of the Superior Courts, or any of them, shall have power to issue writs of *Mandamus*, prohibition, scire facias, and all other writs, which may be necessary, for carrying their powers fully into effect." *(Prince*, 911.) Would it not be absurd to say, that to the Superior Courts belong the constitutional right of using the writ of Mandamus, whenever it is necessary for carrying *their* powers fully into effect; and yet that they may not issue this writ, when it becomes *indispensably* necessary,

for the purpose of carrying into effect an Act of the Legislature, a co-ordinate branch of the Government?

But put this objection in the strongest light for the defendants, and concede that it is a discretionary writ, to be issued *only* where the party has no other specific legal remedy—(and the books do not go as far as this; they hold the proposition as here stated, as the general rule only, to which there are exceptions)—still the case is with the relators. Here is a positive *statutory* right, and the party applying, not only has no other *specific legal* remedy, but no other redress whatever, legal or equitable. Deny this writ, and you abrogate the franchise itself. The Act becomes a nullity. Could the Court hesitate for a moment in such a case? Perhaps it is not going too far to say, that had no remedy existed, it would have been the duty of the Court, in the exercise of its common law powers, to have devised one appropriate to the case; *ubi jus ibi remedium.* There must be no failure of justice for want of adequate relief. Can we say then, that the discretion of the Circuit Judge has been *flagrantly abused* in granting this writ under such circumstances?

On the contrary, we are clear that it was obligatory on him to interpose as he did, promptly and efficiently, in preventing the will of the Legislature from being defeated or evaded; and that had he failed so to do our course would have been plain, and that even the verdict of the jury would have been no justification for his neglect or refusal.

If the right is indisputable—especially if it be *statutory*, and there is no remedy to enforce it but by *Mandamus*—I apprehend the propriety of issuing this writ cannot be disputed. 4 *Bac. Abr.* 496, 518. *Cowper*, 378. *Green vs. The African Methodist Episcopal Church*, 2 *Serg. & Rawle*, 255. *Duffy vs. The Harrisburg and Carlisle Turnpike Company*, 9 *Serg. & Rawle*, 59.

In *The Commonwealth ex rel. &c., vs. The Mayor of Lancaster*, 5 *Watts*, 152, C. J. Gibson remarks, "An action to enforce the right could not be maintained against the corporation, because, performance of a corporate function, is not a duty to be demanded by action, and unless recourse could be had to the functionary in the first instance, the relator might have a case for redress without a remedy."

*The Commonwealth of Virginia vs. The Justices of Fairfax County Court*, 2 *Va. Cases, p.* 9, is a strong precedent upon this

point. After reviewing all of the authorities, the Court says, " The result of these cases seems to be, that the Superior Court of Law, which *quo ad hoc,* possesses the same power belonging to the Court of King's Bench, will oblige all Courts and Magistrates to execute that justice to which any party is entitled, and which they are enjoined to do by law, *especially if it be enjoined by statute,* and that they will do this by Mandamus in all cases, where there is a right and no other specific remedy: that the original nature of the writ, and the end for which it was framed, ought to direct upon what occasions it should issue; that the end for which it was framed, was to prevent a failure of justice and a defect of police, and that it ought to be used on all occasions where there is no other specific remedy, and justice and good government require one : and that ministerial and police officers are not protected from its control, by any discretion which may be supposed to grow out of the nature of their functions."

[5.] The other reasons rendered by the defendants for their resistance may be considered and disposed of together. It was assumed that the language of the Act was not *imperative,* but *permissive* only, leaving it optional with them to act or not as they might see fit. And were it otherwise, they contended that the duty it imposed was not the legal duty of the River and City authorities; and that they consequently could not be compelled to perform it.

The terms of the act are too plain to admit of doubt. By the 3d Section the parties authorized to choose Commissioners, that is the Mayor and Aldermen of the City of Savannah, the Commissioners of Pilotage, &c., and the proprietors and owners of wharves and lands on the shore of Hutchinson's Island, " are *required forthwith to appoint said Commissioners."* It is further provided, that either party may, after giving the other parties interested notice of such appointment having been made, assign and fix a day, when they will proceed to execute the trust conferred upon them by the statute, and it is made the duty of the Commissioners, on the day so assigned and fixed, " to proceed to perform the duties and office required by the Act."

We hold then that the defendants were wrong in the position they occupied, that the Act imposed no obligation, but merely conferred authority, which they were at liberty to accept or decline. It is first made incumbent on them *forthwith* to appoint

Commissioners, and in the next place, it is made the imperative duty of the Commissioners so chosen, to proceed to execute the duty required by the Act, whenever a day is fixed by either party for that purpose, and the rest duly notified thereof.

It may be conceded that the Legislature could not compel the defendants to do any thing not within the line of their duty. It is insisted, however, and we think very properly, that the requisition here made, comes legitimately within the pale of their official functions. Who so fit and proper to execute a commission which had for one of its avowed objects " the improvement of the navigation of the River Savannah," as the Mayor and Aldermen of the City of Savannah and the Commissioners of Pilotage for the bar of Tybee and River Savannah? No one. The entire superintendence and guardianship of the City and River, and the interests and welfare of each, are intrusted by the charter of 1825, and the various Acts amendatory thereof, to these officers. *Dawson's Comp. p.* 464, *secs.* 5, 6, 9. *Pamp. Act of* 1838, *p.* 63, *sec.* 2. *Act of* 1815, *Lamar's Dig. p.* 678. *Act of* 1807, *Clayton's Dig. p.* 425. *Act of* 1828, *Dawson's Comp.* 479.

In the nervous language of Judge Fleming, "well might the Legislature call upon them as public officers, and in the discharge of their official duty, to superintend the location of the line of wharf-heads along the shore of Hutchinson's Island. The Legislature indeed, would have been wanting in its duty to the public, had they authorized this line of wharf-heads to be established, without the supervision of the defendants, whose peculiar duty it is to see that the navigation of the river is not injured by illegal obstructions."

The right of the relators then to this writ, seems to be manifest; and the only obstacle really is the reluctance of the defendants to discharge the duty required of them by the statute, believing, as they no doubt honestly do, that it will result in detriment to the City whose welfare is committed to their hands.— We can appreciate their scruples, but those fears, however well-founded, cannot justify their resistance. It has been well said, that "laws enjoin duties without and against the will of those who are to perform them." In the stern execution of law, a Roman Consul was called on to condemn his own sons to an ignominious death.

During the late pecuniary convulsions, through which we have

passed, when our paper currency, owing to the suspension of the Banks, had depreciated from fifteen to forty per cent. below par, and specie funds were exacted in the payment of debts, how ungracious the office in Judges, Attorneys, Sheriffs and other public agents, to enforce the precepts of the Court at the enormous sacrifice which was made of the debtor's property. Yet no honest man hesitated. How vital to this, and every other business community, that the law should triumph! Were Savannah, our commercial emporium, to be blotted from the map of the State, and her very site become another *Dead Sea*, still, when the sovereign authority *constitutionally* speaks, its mandate must be obeyed!

The Act of 1841 was passed for the purpose of improving the navigation of the River, and benefiting the commerce of the City. Those who obtained its enactment believed, no doubt, that such would be its effects. Should these expectations not be realized, and there is reason to apprehend that they will not be, it will not be the first time where results have failed to fulfil our anticipations. Midas prayed that whatever he touched might be turned into gold, and the request of the Phrygian King was granted. But when the very meats which he attempted to eat became gold in his mouth, he earnestly implored the Gods to take back the fatal gift.

Whether the General Assembly possess this dispensing power in the present case, it is not for this Court to decide. All that we can do now is, to affirm—as we most cordially do—the able and independent judgment pronounced by the Court below.