Goldsmith, comptroller-general, *vs.* The Rome Railroad Co.

GOLDSMITH, comptroller-general, *vs.* THE ROME RAILROAD COMPANY.

[This case was argued at the last term, and the decision reserved.]

1. An act incorporating a railroad company need not express in its title any of the powers, rights, privileges or immunities which the charter is intended to confer. The charter of a private corporation is a contract as between the state and the corporation; and the stipuations, terms and conditions of a contract are to be looked for in the body of the instrument, not in the title or caption.

2. According to the construction placed by this court, in 14 Ga., 275, on the charter of the Rome Railroad Company, taxation by the state on the capital stock of that company is limited to the rate imposed on bank stock at the date of the charter, which rate (See Cobb's Digest, §§1062, 1063,) was thirty-one and a quarter cents upon each hundred dollars of the amount of capital stock paid in. This construction is adhered to.

3. The correct mode of taxing the property of said company under existing laws, is to estimate the whole property at its true value; upon so much of this value as equals the amount of capital stock actually paid in, assess at the charter limit, (thirty-one and a quarter cents on every hundred dollars); and upon the balance of such value, if any, assess at the general rate. Whenever the charter limit exceeds the general rate, the latter should be levied upon the whole value, the limit of the charter being then immaterial.

Constitutional law. Railroads. Corporations. Tax. Before Judge LESTER. Fulton Superior Court. October Term, 1877.

Goldsmith, comptroller-general, issued an execution against the Rome Railroad for $564.75, as its tax for the year 1875, assessed against it upon a return of property made by the president. A levy was made and an affidavit of illegality filed setting up, in substance, the following grounds :

1st. Because the charter of defendant, granted December 21st, 1839, by its 7th section, provides that its stock "shall not be liable for any tax, duty, or imposition whatever, unless such, and no more, as is now in banks of this state," that is, the said stock should not be liable to any tax, etc.,

unless such, and no more, as the stock in banks of this state was then liable to. The amount sought to be collected far exceeds such tax, which would be $124.02, which sum defendant has paid as a condition precedent to filing this illegality.

2d. Because the property sought to be taxed by the act of February 28, 1874, as well as by the amendment to the same, contained in the 12th section of the general tax act of 1875, is such only as is necessary to conduct the legitimate business of the company, and constitutes a part of its capital stock, and as such is not subject to tax as property upon an assessment of value different from its value as stock, the former being much greater than the latter, because not charged with the debts, etc.

3rd. Because the act of the legislature approved February 28, 1874, and also the 12th section of the general tax act of 1875, are void in so far as they attempt to repeal any portion of the charter of defendant, or to impose any other, or greater, or different tax than that authorized by said charter.

4th. Because such charter was a contract upon the faith of which defendant had acted, not subject to be changed or modified without its consent, and the tax by this execution sought to be collected is in violation of its provisions.

Upon the trial of the issue thus formed, the defendant introduced the act incorporating " The Memphis Branch Railroad and Steamboat Company of Georgia," passed December 21st, 1839, and the several acts amendatory thereof, and changing its name to that of the Rome Railroad Company.

The plaintiff demurred to this evidence and to the affidavit of illegality, upon the following grounds :

1st. Because the 7th section of the act of 1839 is too vague, indefinite and ambiguous to constitute any valid contract between the state and said company.

2d. Because said section is void by reason of containing matter different from what is expressed in the title of said act.

The court, to which the questions made were submitted without the intervention of a jury, overruled the demurrer, sustained the illegality, and ordered the levy dismissed, to which the plaintiff excepted.

R. N. ELY, attorney-general; R. TOOMBS, for plaintiff in error.

McCAY & TRIPPE; HENRY HILLYER, for defendant.

BLECKLEY, Justice.

In the record, is a very learned and lucid opinion by Judge Lester, giving his reasons for overruling the demurrer to the affidavit of illegality. We entirely agree with him upon both points involved in the demurrer, and though we pronounce a conditional reversal of his judgment dismissing the levy, we do so with no view of reinstating the demurrer, but as an exercise of the discretionary power conferred on this court by statute to give direction in respect to the ulterior proceedings in a cause. It may be that on another trial of the affidavit of illegality, the correct amount due from the corporation for taxes for the given year can be arrived at, and that no new assessment will be necessary. If this should be so, the affidavit of illegality should be sustained as to the excess of taxes only ; but if the true amount be unascertained, or unascertainable without a new assessment, then the execution should be quashed ; for certainly the whole amount of it is not due, if, as may be assumed, the property of the corporation has been assessed at the full general rate, and none of it at the restricted charter rate.

1. The doctrine that the charter of a private corporation is, as between the state and the corporation, a contract, has become an established principle of American law. Uniformity and universality have been imparted to the rule by repeated decisions of the Supreme Court of the United States; so that now nothing in the whole range of law is

better settled. A law or ordinance to incorporate a railroad company, is thus a law or ordinance to contract with 'it on the part of the state. Notice given in the title or caption of the act, that the state means to incorporate something, comprehends notice that it means to contract. Why should the terms, specifications and conditions of a contract be indicated in the caption or title ? They are appropriate to the body of the instrument, and are generally looked for in the body, not in the caption or title. In a narrow and literal view, an act to incorporate is merely an act to create a body politic ; but by a practice almost or quite universal in this state, and perhaps in every other, a statute of incorporation goes on to express, with more or less particularity, the rights, privileges and immunities which the corporate being is designed to exercise and enjoy. To grant a charter is, generally, not to carve out a mere trunk and infuse into it the breath of life, but to furnish it with limbs and members, and circumscribe and define its sphere of action, and, frequently, to define the limitations, or some of them, upon the action of other beings, including the state itself, in respect to the new corporate entity. In putting a new star in the legal firmament, not only is its orbit prescribed, but the motions of other stars, and of the sun itself, are, to some extent, regulated and re-adjusted. An example of changing the general law relatively to a particular corporation, by its charter, is found in 31 *Ga.*, 69 ; and *there*, as here, the title of the act was simply to incorporate.

The opinion of Judge Lester upon this point in the case, is so thorough, exhaustive and satisfactory, that I quote it as a fit expression of the opinion of this court:

" The attorney-general contends that the 7th section of the defendant's charter is void, because it contains matter different from what is expressed in the title thereof, in violation of the 17th section of the 1st article of the then constitution of this state. The clause of the constitution referred to is in these words: ' *Nor shall any law or ordinance pass containing any matter different from what is*

*expressed in the title thereof.'   Prince's Digest,* 904.   The
following is the title to the act by which the defendant was
incorporated, to-wit: '*An act to incorporate the Memphis
Branch Railroad and Steamboat Company,*' and the clause
in the charter which it is contended is in conflict with the
clause of the constitution before quoted, is in these words:
'*And that its stock shall not be liable to  any tax, duty, or
imposition whatever, unless such, and no more, as is now
in bank of this state.'—acts of* 1839, *p.* 108.   In 1849, the
defendant's name was changed to that which it now bears,
and its rights and privileges confirmed.   *Acts of* 1849–50,
page 243.   I have thus quoted the three clauses involved
·in the consideration of the question made by the attorney
general, so that we may have them before us, in one group,.
for convenient reference; and I shall consider the clause in
the charter as meaning what the Supreme Court interpreted
it to mean.   Now, the question to be determined is, is the·
clause of the charter violative of the constitution?   Is it
within the mischief intended to be suppressed by that sec-
tion of the constitution?   Does it contain matter different
from what is expressed in the title of the act incorporating·
the company?

    " The zeal and earnestness, and apparent candor with which»
this point was pressed in the argument, induced me to study·
the question with more than ordinary care.   I have criti-
cally examined every case in which this provision of the·
constitution has been applied by our own supreme court, and
I have examined the adjudicated cases in other states, whose·
constitutions contain a similar provision to that of our own,.
so far as I had access to the reports.   I have also carefully·
examined several text-books bearing on the subject, directly·
or indirectly, and these authorities, coupled with my own
reflections, have freed my mind from all doubt on the ques-
tion involved, and brought me to a conclusion that is at least
satisfactory to myself.   Without spreading out these au-
thorities at length, and without giving the facts in each case
in detail, I will simply refer to the following authorities:

Conner *vs.* The Mayor, 1 Seld., 285; Sun Mutual Insurance Company *vs.* The Mayor, 4 Seld., 241—both New York cases; Murphy *vs.* Menard, 11 Texas, 673; Sedgwick on Statutory and Constitutional Law, 569; *The Mayor and Aldermen of Savannah et al v The State, ex relatione Greene et al.*, 4 *Ga.*, 26; *Prothro & Kendall vs. Orr· et al.*, 12 *Ga.*, 36; *Justices of Inferior Court of Lee County vs. Hunt et al.*, 29 *Ga.*, 155; *Sanders vs. Town Commissioners of Butler*, 30 *Ga.*, 679; *Robinson et al. vs. The Bank of Darien*, 18 *Ga.*, 65; 6 *Ga.*, 21; 49 *Ga.*, 232; 31 *Ga.*, 69; 51 *Ga.*, 639. From a careful review of these authorities, and others cited by the counsel, and some that were not cited, and to which it is not necessary to refer, I deduce the following points and principles as well settled: 1. The provision of the constitution which we are now considering, was inserted in the fundamental law of our state, in order to protect the people against sinister, selfish and fraudulent legislation, by requiring that the *title* of every act should indicate the *subject* upon which it was intended to legislate, so that neither legislators nor people should be misled or entrapped by the title of a bill, as they were in the matter of the act under which the celebrated Yazoo fraud was perpetrated. 2. It never was intended, by such a provision, that the title of an act should contain a synopsis of the act, or embody all the distinct features or provisions of the statute in detail. To so construe that clause of the constitution as to require this, would, in effect, obliterate from the statute book many of our best and most wholesome laws. 3. It would be improper to give to constitutional provisions of this kind a too rigorous and technical construction; for if, in applying them, we should follow the rules of a nice and fastidious verbal criticism, we would often frustrate the action of the legislature without fulfilling the intention of the framers of the constitution. 4. In the cases before our supreme court, in which they have held statutes to be unconstitutional because they contained ' matter different from what was expressed in the title thereof,' the court has also

held, that if the title of the acts have been. *general,* or if the title, after designating a particular object, had added, *'and for other purposes,'* the construction would have been different, and the statutes would have been held to be constitutional. This point is especially stated in 12 *Ga.,* 36, and in 30 *Ga.,* 679. Indeed, it will appear from an examination of the statutes and digests of this state, that some of the most important laws now in force in Georgia, laws upon which we depend for the protection and security of our dearest rights, were passed by the legislature and approved by the governors, under indefinite titles like the following : *'An act supplementary to the judiciary act,'* without indicating the supplementary matter ; *'An act to alter the law in relation to lapsed legacies,'* without expressing the alteration intended ; *'An act in addition to the acts concerning the guardianship of minors,'* without indicating the branch of the subject to be added to, or the addition sought to be made to it; *'An act explanatory of the several judiciary laws of this* state,*'* without informing the legislators of the explanatory matter, but leaving them to hunt for it in the body of the bill. I give these as examples of indefinite titles, that do not *express* the matter embodied in the acts to which they relate, and the examples might be multiplied indefinitely. It seems to me that an application of the foregoing points and principles to the case at bar, will render it clear that a clause in the charter of a railroad company exempting its stock from taxation, or fixing a rate of taxation to which it shall be liable, or prescribing a particular mode of taxing it, does not. contain matter different from, or inconsistent with, what is expressed in the title of *'An act to incorporate it.'* What do we mean by an act 'to incorporate' a railroad company ? Suppose a bill to be entitled *'An act to incorporate the Rome Railroad Company'* should be offered in the legislature, what would the legislators present understand such a bill to be ? What would they think was intended by it ? What is expressed in the *title* of *that* sort of

a bill? In legal parlance, it means that the author of the bill proposes to make an artificial person, or to create a corporation for the purpose of constructing and operating a railroad, and to clothe it with such attributes and powers, and impose upon it such duties and liabilities, and to grant it such privileges and immunities, as in the judgment of the legislature will be necessary, or proper, or appropriate for such an enterprise. The very nature of a corporation indicates that such is a correct view of the objects and scope of an act of incorporation. *All corporations are incorporated,* and whilst there are some attributes and powers common to all, yet some have powers that others do not have. Some corporations have privileges and immunities that others do not have. Some corporations enjoy exemptions, and even monopolies, that others do not. Yet, they are all corporations, and all have been 'incorporated.' The act by which they are incorporated is usually called a charter, and we look to the charter of a corporation to find its attributes, its powers, its privileges, its immunities, and its exemptions, for the *charter* contains the grant and the measure of them all. If the corporation claims a right, a privilege, or an exemption, we look to its charter, the act incorporating it, and if it be found there, we yield to it the right, privilege, or exemption claimed; but if it be not so nominated in the charter, the claim is denied. I undertake here to assert, that the legislature of Georgia never passed 'an act to incorporate' any company, in the *title* of which the attributes, powers, rights, liabilities, privileges, immunities and exemptions of the company were *expressed ;* and yet all these have been granted and conferred upon corporations by their *charters,* under the simple *title* of 'an act to incorporate' the company. Under that title, and nothing more, the legislature has incorporated railroads, and vested in them the right to take and appropriate the private property of the citizens of the state ; granted them monopolies by declaring that no parallel road shall be built within twenty miles of their track ; exempted them from taxation, or fixed the rate at

which they should be taxed; given them power to construct branch roads, and conferred upon them other important privileges and immunities, about which nothing was *specified* in the title of the act of incorporation. All these grants of powers and privileges have been deemed a part and parcel of the work of *incorporation*, and when the legislature is engaged in doing these things for a company, they are *incorporating* it, and are not doing something *different* from an act of incorporation. Hence, an act to incorporate the 'Rome Railroad Company,' is to give it a corporate existence, to give it perpetual life, to enable it to exercise the right of eminent domain, and if, in the judgment of the legislature, the enterprise in which it is about to engage will be of benefit and advantage to the public, by opening up lines of commerce and travel, to foster and encourage the enterprise, and by way of inducing individuals to embark in it, to declare that the road shall be protected against rival lines, and that the capital invested in it shall be exempt from taxation, or that it shall only be taxed to a specified extent, and to give the company any other right, or impose upon it any duty, which is not variant from, or inconsistent with, the object and design of its creation. For the definition of a corporation, which I have kept constantly in view, in this opinion, I refer to Kyd on Corporations, 13; 4 Wheaton, U. S. Rep., 636; and Angel & Ames on Corporations, p. 1 §2, pp. 3 and 4, §6. The view which I have presented of acts of incorporation, and the titles of such acts, is in perfect harmony with the opinions and practice of the government in all of its departments, for scores of years past. These acts have been passed at different times by legislatures which numbered amongst their members some of the best lawyers Georgia ever knew. They were criticised and approved by governors of acknowledged ability, whilst the judicial and professional mind of the state has acquiesced in their validity with uncommon unanimity, and I feel constrained to follow in the path which they have illumined with their learning."

2. Having held the title of the act of incorporation sufficiently comprehensive and specific to cover a limitation upon the taxing power of the state, in respect to the corporate assets, the next question concerns the interpretation of the seventh section of the charter. Does that section disclose with sufficient certainty a purpose to limit the taxing power, and define the limit intended? The answer is found in the ruling of this court in the case of *The Rome Railroad Company vs. The Mayor and Council of Rome*, 14 *Ga.*, 275. On the argument of the present case, leave to review the decision first cited was asked and granted; but a ruling which has stood for a long period—twenty-five years or more—ought not to be changed without a very clear conviction of its error. Instead of seeing error in the decision arrived at by our predecessors, we are inclined to the belief that they penetrated to the real truth of the legislative intent. Distressingly loose and ambiguous was the language they had to deal with, but we are persuaded they discovered its real meaning; and certain it is that no meaning more satisfactory to our own minds has been suggested. We accordingly adhere to that decision. Its import is this: that taxation by the state on the capital stock of the corporation is limited to the rate imposed on bank stock at the date of the charter, which rate (see Cobb's Dig., 1062, 1063,) was thirty-one and a quarter cents upon each hundred dollars of the amount of capital stock paid in. For the purpose of taxation, the stock of a bank had no relation to the amount of stock authorized by the charter, or subscribed by the stockholders, or covered by certificates of stock, but was confined to that " operated upon or employed within this state," and was the equivalent of " the amount of capital stock actually paid in," on or before the first of January preceding the making of the required return. It matters not, therefore, how much or how little stock was subscribed for or issued in the present case; the limited taxation is upon the stock actually paid in, and upon nothing else. For each one hundred dollars which the stockholders parted

with to the corporation, the state, in taxing the corporate property or the capital stock, may assess thirty-one and a quarter cents, but no more.    But when this much has been levied upon the corporate properety, if the property is of greater value than the whole amount paid in, the excess is not stock, within the true sense and meaning of the charter, but accumulation from appreciation or profit, and is there-fore subject to taxation at the general rate at which the property of the people is assessed.    To uphold this ruling, it is only necessary to read the charter, and the tax acts above cited providing for the taxation of the stock of banks, to-gether with the case from 14 *Ga.*    There is one aspect in which the amount of stock authorized by the charter has relevancy, and that is, that should the amount paid in ex-ceed that sum, the excess, if any, paid in over and above the maximum of the charter, would not fall under the charter limit as to therate of taxation.    Thus a case may be supposed where the authorized capital stock of a cor-poration is five hundred thousand dollars, and where the stockholders have paid in six hundred thousand dollars.  In such case, the one hundred thousand dollars above the char-ter maximum would, of course, be volunteer capital, so to speak, and would stand outside of the provisions of the charter touching reduced taxation.

3.  The tax now sought to be collected of the Rome Rail-road Company was not laid directly upon its stock, but up-on its property.    The railroad tax act of 1874 (re-enacted substantially each subsequent year) contemplates that the property of railroads shall be taxed just as the property of the people generally is taxed.    To reach this result, the act sought to repeal and cancel all exemptions granted to rail-roads in their charters ; but this object failed as to charters prior to the Code, the supreme court of the United States hav-ing held, in effect, that the taxing power was in Georgia, as in other states, a subject matter of bargain and sale.  92 U. S., 143. My own views upon this subject have been expressed in 55 *Ga.*, 312, and as they belong to that part of *truth* which is not

yet recognized as *law*, they need not be re-stated here. Effect must be given to the principle announced by the supreme court of the United States, and the practical inquiry now is, how is the Rome Railroad Company to be taxed under existing laws, that principle included? In the absence of exemption, or of limitation upon the taxing power in the charter, the Rome Railroad Company would have to pay the same tax upon its property as any citizen of Georgia pays upon property of like value. The first step, then, is to ascertain the aggregate value of the property belonging to the Rome Railroad Company, just as if the company was a natural person. For taxation, this value, supposing it to be no more than the amount of stock authorized by the charter and actually paid in, should be assessed at thirty-one and a quarter cents on each one hundred dollars; but should it exceed the authorized amount actually paid in, the excess should be assessed at the general rate prescribed by authority of law. The view on which this rule of taxation rests is this: that the property of the corporation represents the stock paid in, in the ratio of one dollar in property to one dollar in stock, and that the excess in property, if any, represents additional assets resulting from appreciation of property over first cost, or else from accumulation by reason of profits earned, but not distributed. The charter fixes no limit to taxation except as to stock paid in, and this limit is respected when the tax on property is not greater than it would be if it were imposed directly on the stock— dollar for dollar, to the extent of the stock paid in. The property-tax beyond that extent is outside of the charter, and is properly controlled by the general law. Of course when the general rate on property is less than the charter limit on the stock paid in, the charter limit is immaterial, and the general rate should be levied upon the whole value of the corporate property. These views upon the proper mode of assessing the corporation are essential to the judgment which we pronounce; that judgment being one of reversal, with direction that the amount due for taxes be

ascertained on the basis of taxation indicated in the opinion of this court, if that can be done without a new assessment by the comptroller-general, and if not, that the affidavit be sustained without prejudice to a new assessment and to another *fi. fa.*, if necessary, to enforce the same.

Reversed as above.