Wellborn *vs.* Estes.

## WELLBORN *vs.* ESTES.

[This case was brought forward from the last term, under §4271 (a) of the Code.]

1. Legislative acts in violation of the constitution of this state or of the United States are void; and it is the duty of the judiciary so to declare them; but before an act of a co-ordinate department of the government will be declared unconstitutional, the conflict between that act and the fundamental laws must be clear and palpable.

2. The object of construction, as applied to a written constitution, is to give effect to the intention of the people in adopting it, and to determine the thought which the constitution expresses. The whole instrument should be examined, with a view to arriving at the true intention of each part, and effect should be given, if possible, to every part.

(*a*.) The practical exposition of the government itself, in its various departments, furnishes a collateral means of interpretation.

3. Construing the different provisions of the constitution of 1877 so as to give effect to each in respect to the elections and terms of office of judges of the superior court, the purpose of that instrument was as follows: to give each judge of the superior court thereafter to be elected an official term of four years, provided he was chosen as the successor of one who was an incumbent at the time of the election; that the judges should be so classified as to bring on the election of one-half of the number (as nearly as might be) at each regular biennial session of the general assembly; that the

term of each one, so elected at the close of the full term of his predecessor, should commence on the first day of January next thereafter; that a vacancy in office from any cause should be filled by appointment of the governor until the convening of the general assembly; that upon their convening they should fill, by election, the unexpired portion of the vacant term.

4. Where a new judicial circuit was created at a prolonged session of the general assembly, held in an intermediate year between the years for the regular biennial session, it was the duty of the legislature to assign the judgeship to one of the classes fixed by the constitution, and the time between the creation of the office and the regular election of the class of judges to which it was assigned occupied the position of a vacancy to be filled by the general assembly.

(a.) Therefore a provision in the act creating such office, "that a judge shall be elected by the general assembly at the present session to hold office until the next regular election for half the judicial circuits already established, and until the time fixed by law, after said election, when the terms of said judges expire," was not unconstitutional.

5. It is not decided whether these are legislative or judicial questions, but that the unconstitutionality of the act has not been made apparent.

March 13, 1883.

Constitutional Law. Judges. Courts. Before Judge HARRIS. Hall county. At Chambers: January 27, 1883.

Carlton J. Wellborn filed his petition for leave to file an information in the nature of a *quo warranto* against John B. Estes. The petition alleged, in brief, as follows: On August 8, 1881, the legislature passed an act creating the Northeastern Judicial Circuit. On August 11, Wellborn was regularly elected judge of the circuit, and was commissioned on the following day. The commission, which was attached as an exhibit to the petition, provided that it should "remain in force until the first day of January, 1883, and until your successor is elected and qualified in the mode pointed out by the constitution and laws of this state." By the second section of the act creating the circuit it was provided that the judge first elected should hold his office until January 1, 1883. Under his

election, Wellborn proceeded to perform the duties and enjoy the emoluments of the office. On November 21, 1882, the general assembly proceeded to vote for a judge for said circuit, to hold office from January 1, 1883, for the term of four years. At this election, Estes received a majority of the votes cast, was declared elected, was commissioned, and, since January 1, 1883, has proceeded to act as judge. The petitioner insists that the second section of the act of 1881, limiting the term of the first incumbent, was unconstitutional, that the election thereunder was of no effect, and that the acts of Estes as judge amounted to a usurpation of petitioner's rights.

A rule *nisi* was issued, calling on Estes to show cause why an information in the nature of a *quo warranto* should not be filed.

Respondent demurred to the petition, and for cause why the information should not be filed, showed as follows: By the act of August 8, 1881, the Northeastern Circuit was created, and it was provided that a judge should be elected at the pending session of the legislature, to hold office until the next regular election of judges for half the judicial circuits already established, and until the time fixed by law, after said election, when the terms of said judges should expire; and that at said next regular election a judge should be elected for the full term, who should hold office as the other judges then elected for existing circuits; and that thereafter a successor of the judge so elected should be elected as provided by the constitution and laws. In pursuance of a joint resolution of the legislature to elect a judge for the term prescribed in the act, Wellborn was elected and commissioned. He accepted this commission, and under it acted as judge. On November 21, 1882, the general assembly proceeded to elect a judge for the full term. Petitioner and respondent were both candidates, and both received votes, but respondent receiving a majority, was declared elected for the full term of four years, was duly commissioned, and has, since January 1, 1883,

acted as judge thereunder. Both parties were eligible to election.

The hearing was had at chambers, January 27, 1883. The prayer of the petitioner was refused, and the petitioner excepted.

In support of their position, counsel for plaintiff in error cited the following authorities: On term of office, Const. 1877, section 3, par. 1–2; 1 McCord, 154–5; 37 Cal., 614; 12 *Id.*, 391. Not a vacancy, Const., art. 6, sec. 3, par. 2–3; 54 *Ga.*, 391; 44 *Ga.*, 76. Election in 1882 invalid, 5 Wend., 423; 11 Cal., 77, 88; 12 *Id.*, 378. Creation of circuit valid, fixing the term invalid, 1 McCord, 155; 2 Wend., 266; 11 *Id.*, 132; 12 Cal., 378. Not a political question, 2 Ala., 31; 1 *Id.*, 688; 12 Cal., 378; 42 *Ga.*, 405; 62 Pa., 343; 3 Snead, 6.

Cited by defendant in error: Judges classified, Const., 1868, art. 5, sec. 3, par. 1; 54 *Ga.*, 393; Convention proceedings, 1877, pp. 163, 232; Const., 1877, art. 6, sec. 7, par. 2; Ordinance, Code, p. 1328; Acts, 1881, p. 12. Vacancy, 44 *Ga.*, 76; 49 *Id.*, 115; Acts, 1855–6, p. 216; 89 Pa. St., 419; 7 Ind., 329; 8 *Id.*, 350; 5 Nev., 111; 6 How. (Miss.), 601; 1 Opinions att'y gen'l, 631; 2 *Id.*, 525; 3 *Id.*, 673; 14 *Id.*, 2. Political question, 41 *Ga.*, 161; 7 Howard, 43; 13 Wallace, 649; 6 *Id.*, 50.

E. N. BROYLES; F. L. HARALSON; R. J. McCAMY, for plaintiff in error.

HOPKINS & GLENN; DUNLAP & THOMPSON, for defendant.

HALL, Justice.

The sole question made in this case is, whether that portion of section 2 of the act of the general assembly of 1881 (p. 112), establishing the Northeastern judicial circuit, in the words following: "That a judge shall be elected by the general assembly at the present session, to hold office until the next regular election for half the judicial circuits

already established, and until the time fixed by law, after said election, when the terms of said judges expire," conforms to that provision of the constitution fixing the term of office at four years, and until his successor is qualified. Art. VI., §3, par. 1, constitution of 1877 (Code, §5136), and to other provisions of that instrument, relating to the same subject, especially par. 2 and 3 of the same article and section (Code, §§5137, 5138), which are as follows: "The successors to the present incumbents shall be elected by the general assembly, as follows: to the half (as near as may be) whose commissions are the oldest, in the year 1878; and to the others, in the year 1880. All subsequent elections shall be at the session of the general assembly next preceding the expiration of the terms of incumbents, except elections to fill vacancies. The day of election may be fixed by the general assembly."

"The terms of the judges to be elected under the constitution (except to fill vacancies), shall begin on the first day of January after their elections. But if the time for the meeting of the general assembly shall be changed, the general assembly may change the time when the terms of judges thereafter elected shall begin."

By section 12, par. 1, of the same article, it is provided that, "The judges of the superior court" (among other officers named) "shall be elected by the general assembly, in joint session, on such day or days as shall be fixed by joint resolution of both houses. At the session of the general assembly which is held next before the expiration of the terms of the present incumbents, as provided in this constitution, their successors shall be chosen; and the same shall apply to the election of those who succeed them. Vacancies occasioned by death, resignation, or other cause, shall be filled by appointment of the governor, until the general assembly shall convene, when an election shall be held to fill the unexpired portion of the vacant terms. Code, §5161.

By an ordinance of the convention which framed this

constitution, it was declared that, "There shall be sixteen judicial circuits in this state, and it shall be the duty of the general assembly to organize and proportion the same in such manner as to equalize the business and labor of the judges in said several circuits, as far as may be practicable. But the general assembly shall have power hereafter to re-organize, increase, or diminish the number of circuits; provided, however, that the circuits shall remain as now organized until changed by law." Code, 1882, p. 1328.

The act of the 8th of August, 1881, organizing and creating this judicial circuit, after fixing the term of the first judge elected and commissioned under it, further provides that, after his term expires, " at the next regular election of judges for the circuits of the state, a judge for said northeastern circuit shall be elected for the full term, who shall hold office as the other judges then elected for the other existing circuits, and his successors shall be thereafter elected as provided by the constitution and laws." Acts 1880–1, p. 113.

The plaintiff in error, who was the first judge elected under the act creating the circuit, and who was commissioned in pursuance of the act, to hold his office from the date of his election in August, 1881, until the first day of January, 1883, contends that so much of the act as limited his official term to that date, and provided for the election and qualification of his successor at the session of the general assembly next preceding that period, was repugnant to the above recited provisions of the constitution and of the ordinance of the convention that framed the constitution; and that the requirements thereof could only have been complied with by extending his term to the first day of January, 1885; that his successor could not have been legally elected, except at the session of the general assembly next preceding this date, viz.: at the session of 1884; and that, inasmuch as his office was created by the constitution, and the term thereof was fixed by the

v 70–26

:same instrument, it continues, notwithstanding the election of the defendant in error as his successor, by the session of the general assembly of 1882, under the provisions of the act, and his commission and qualification by the governor, in pursuance of said election.

In determining questions of such moment and delicacy as those here presented, we feel bound to proceed with great caution, and not to set aside the action of a co-ordinate department of the government, except where the conflict between that action and the fundamental law is clear and palpable. It must be so apparent as to leave no reasonable doubt as to its existence, upon the judicial mind. We hold, with an eminent judge and learned commentator, that "constitutions are not designed for meta physical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss." 1 Story's Com., §451. Hence results the rule that "every word employed in them is to be expounded in its plain, obvious and common sense, unless something else in them furnishes ground to control, qualify or enlarge it." *Ib.* "The familiar rule," says Sharkey, C. J., in Smith *vs.* Halfacre (6 Howard, Miss. R., 600), "that all instruments must be construed according to the sense of the terms used, and the intention of the parties, is as applicable to constitutions as anything else; perhaps it is more so, as a constitution is but a general form of government, the details being left to legislation. One of the primary objects of a constitution is a harmonious order in the operations of the several departments of the govern-

ment, and where the instrument is doubtful, or not sufficiently specific in its provisions, we may safely conclude that it was not the intention of the framers to produce disorder and confusion.

"We must, in the next place, look to 'the scope and design of the instrument, viewed as a whole, and also viewed in its component parts.' If the design and object be clear, although the provisions may seem to be doubtful, we have a sure guide to a proper construction.

"Where a constitution is not entirely explicit in itself, and requires construction, it ought not to be so construed as to cripple the government and render it unequal to the objects for which it is declared to be instituted." Citing 9 Wheat. R., 1.

The object of construction, as applied to a written constitution, is to give effect to the intent of the people in adopting it. "The thing which we are to seek is the thought which the constitution expresses. "The whole instrument is to be examined with a view to arriving at the true intention of each part. In comparing one part of the instrument with another," it is not to be supposed that any words have been employed without occasion, or without intent that they should have effect as part of the law. The rule applicable here is, that effect is to be given, if possible, to the whole instrument and to every section and clause. If different portions seem to conflict, the courts must harmonize them, if practicable, and must lean in favor of a construction which will render every word operative, rather than one which makes some idle and nugatory.

The rule is applicable, with special force, to written constitutions, in which the people will be presumed to have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, leaving as little as possible to implication. It is scarcely conceivable that a case can arise where a court would be justifiable in declaring any portion of a written constitution nugatory because of ambiguity. One part

may qualify another so as to restrict its operation, or apply it otherwise than the natural construction would require, if it stood by itself; but one part is not to be allowed to defeat another, if, by any reasonable construction, the two can be made to stand together." Cooley Const. Lim., marg. pp. 55, 56, 57, 58.    Says Marshall, Ch. J., (Gibbons vs. Ogden, 9 Wheat., 188), " The framers of the constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have understood what they meant."    " This," remarks Judge Cooley (Const. Lim., p. 58 marg.), " is but saying that no forced or unnatural construction is to be put upon their language, and it seems so obvious a truism that one expects to see it universally accepted without question; but the attempt is made so often by interested subtlety and ingenious refinement to induce courts to force from these instruments a meaning which their framers never held, that it frequently becomes necessary to redeclare this fundamental maxim.    Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government."

So solicitous have the courts been to avoid everything that even looks like thwarting a portion, however small, of the sovereign will, as embodied in this fundamental law, that they have not only called to their aid implications from the instrument itself, but have even gone outside of the constitution to find reasons for avoiding it; they have availed themselves not only of the proceedings of the convention which framed it, but have sought for the practice of other departments of the government, and paid great deference to their action. and especially to the action and opinions of those who were cotemporaneous with it, which would seem to have peculiar claims to our regard upon the question under discussion, because " they

had the best opportunities of informing themselves of the understanding of the framers of the constitution, and the sense put upon it by the people when they adopted it." Cooley Const. Lim., marg. pp. 66–70.

A writer of eminence and authority has said, "After all, the most unexceptionable source of collateral interpretation is from the practical exposition of the government itself, in its various departments, upon particular questions discussed and settled upon their single merits. These approach the nearest in their own nature to judicial expositions, and have the same general recommendation that belongs to the latter. They are decided upon solemn argument *pro re nata*, upon a doubt raised, upon a *lis mota*, and a deep sense of their importance and difficulty, in the face of the nation, with a view to present action in the midst of jealous interests, and by men capable of urging or repelling the grounds of argument, from their exquisite genius, their comprehensive learning, or their deep meditation upon the absorbing topic. How light, compared with these means of instruction, are the private lucubrations of the closet, or the retired speculations of ingenious minds, intent on theory, or general views, and unused to encounter a practical difficulty at every step." 1 Story, Com. Const., §403. Cooley Const. Lim., marg. p. 69.

This case furnishes a striking illustration of the force and propriety of these remarks. Doubtless the questions here involved did not escape the scrutiny of the general assembly that passed this law and elected the first officers under its provisions; nor could it be supposed, with propriety, that the executive, who sanctioned and approved the law and commissioned the officers elected under it, failed to give them due consideration. Certain it is, that the general assembly of 1882, which elected the plaintiff's successor, did not act without consideration; the questions here involved were fully discussed and thoroughly investigated by that body, and settled, upon great deliberation, as the journals of both houses fully attest, and after the

attention of every department of the government was thus solemnly called to them, the executive issued a commission and qualified the person chosen by this second election under the act. Nor are these the only instances of such action upon the part of the legislative and executive departments of the government of the state upon similar provisions contained in former constitutions; or of the other states, and of the general government, as was abundantly shown in the able and exhaustive opinion of McCay, J., who spoke for the majority of this court in *Gormley vs. Taylor*, 44 *Ga.*, 76, and again affirmed by a majority of the court in *Holtzclaw vs. Russ*, 49 *Ga.* 115; Trippe, J., speaking for the court in that case.

But expounding the constitution by its own terms, and giving full effect to each of the provisions above set forth, it is manifest that the purpose of that instrument was to give to each judge of the superior courts thereafter to be elected:

1st. An official term of four years, provided he was chosen as the successor of one who was an incumbent at the time of the election.

2d. That the judges were to be so classified as to bring on the election of one-half of the number, as near as might be, at each regular biennial session of the general assembly.

3d. That the term of each one so elected, at the close of the full term of his predecessor, should commence on the first day of January next thereafter.

4th. In case of a vacancy in the office, from any cause, it was to be filled by appointments of the governor, to last until the general assembly should convene.

5th. When the general assembly should so convene, they were required to fill, by election, the unexpired portion of the vacant term.

This circuit was created at a prolonged session of the general assembly, held in a different year from that when the body is regularly convened on the day fixed by law

for its biennial session. The election was held at a different time, and in a different year, from that contemplated by the constitution for the holding of elections for full terms, or the filling of the unexpired portions of such as had become vacant. To one or the other of these classes, the general assembly was compelled to assign this judgeship; it was as competent to select the 1st day of January, 1883, for the commencement of the full term, as to make it begin on the 1st day of January, 1885, and to bring on the election at the session of 1882, as at that of 1884. In neither event could the judge first elected have more than the remnant of a full term, and it is unimportant, in a legal and constitutional sense, whether that remnant covered less than two or four years, as was necessarily the case in this instance.

That it was the purpose of the convention that framed the constitution to make this classification the policy of the state, is evident from the debates and proceedings of that body. Mr. Hammond, a delegate from Fulton county, addressing himself to this subject, said: " I desire to make an amendment of this paragraph, which reads, ' that the successors of the present incumbents shall be elected by the general assembly, as their terms expire, beginning in 1880.' The paragraph, as it stands, makes all of the judges and solicitors come before the legislature at the same time. The general assembly, in 1881, would elect all these officers, and the general assemby of 1883, would elect none. In the meantime you will have a new governor and a new general assembly, but nothing new as to the judiciary. It makes the machinery of the state work unevenly. I think we should bring on the election of one-half of these judges during each executive term. The governor holds for two, and they hold for four years. In order that each one of these legislatures may equal each other in power, I move this amendment as a substitute for par. 3, §3. My amendment is, ' the successors of the present in-

cumbents shall be elected by the general assembly as follows: the half, as near as may be, whose commissions will soonest expire, shall be elected in the year —— and the others in the year——.  All subsequent elections shall be upon the expiration of the terms of the incumbents, except elections to fill vacancies.  The days of elections may be fixed by the general assembly.'  I will remark that the reason I did not fill the blanks is because I did not know the wishes of the convention to fix the removals."

He then moved to insert in the blanks "1880 and 1882." Mr. Brown moved to insert "1878 and 1880."  This motion finally prevailed.  Before it was put, however, Mr. Matthews asked if that would not prolong the terms of some of the judges?  To which Mr. Hammond responded, "I understand it would prolong the term of one of them a few months."

Mr. Matthews: "Would it not prolong the term of two of them at least?"

Mr. Hammond: "I was after fixing the date, without regard to men."

Mr. Nisbett: "Wouldn't the gentleman now accept ' unless their terms sooner expire,' as an amendment?"

Mr. Hammond: "I have no objection to receiving the idea, but the language is not such as I would use.  I will amend by saying: 'In case the terms sooner expire, the governor shall fill them by appointment, until the day of their election arrives.'"  As thus amended, this paragraph was adopted without a division.  Proceedings of Convention, 1877, pp. 232, 233.

But, apart from this, there cannot be a doubt, from the language of the constitution, that each legislature was to fill the terms of half the judges (as near as might be) by election, and that each of these full terms was to commence on the first day of January next after the election; and that this time for the commencement of such terms should continue so fixed unless " the meeting of the general assembly should be changed," in which event, that body

might change the time when the terms of judges to be thereafter elected should begin. Const., art. 6, §3, par. 2. Neither this paragraph nor the one succeeding is applicable to terms that commence irregularly; these should be treated as vacancies, which are expressly excepted from the operation of these clauses, and are specifically provided for in the last clause of par. 1, §12 of the same article, which provides that vacancies occasioned by death, resignation or other cause, shall be filled by appointment of the governor, until the general assembly shall convene, when an election shall be held to fill the unexpired portion of the vacant terms.

The only interpretation we can put upon these several provisions of the constitution, which will harmonize them and give effect to all and every part of them, and preserve intact the policy which they establish, is to treat this office as a vacancy as soon as it was created, and then to fill it by election of the general assembly. We do not deem it at all doubtful that the leading purposes of the constitution was to have these terms expire at different times, so that one-half of them, as nearly as practicable, would be supplied by each legislature that assembled; that they should commence on the day named, and that there should be a full term assigned to each one elected, save only in the case of a vacancy. But if it were doubtful, then, under the rule of construction above set forth, it should be our purpose so to interpret it as to give effect, if possible, to the whole instrument and to its every section and clause. If portions seem to conflct, we should, if practicable, harmonize them, and we must lean to that construction which will bring about this result; for, we repeat that it is scarcely conceivable that a case can arise where a court would be justifiable in declaring any portion of a written constitution nugatory because of ambiguity, or so treating it as to render any word there " inoperative," or " idle " or " nugatory." We only adopt rules which have obtained in all other courts, who have dealt with these questions,

under constitutions containing such provisions as our own. The numerous cases upon the question will be found in the brief furnished by the eminent counsel for the defendant in error which appears in the reporter's statement; while the assiduity and learning of the plaintiff's counsel have resulted in finding no case to the contrary, and our own careful investigation and extensive research, has enabled us to discover nothing adverse to the result we have been compelled to reach, because, as we believe, no such thing exists, either in text books of authority or the decision of courts.

We do not propose to enter upon the discussion of the much mooted and stubbornly contested point of whether these are legislative or judicial questions, but content ourselves with quoting the explicit terms of our constitution: "That legislative acts in violation of this constitution or the constitution of the United States are void, and the judiciary shall so declare them" (Code, §5028), with the qualification that this "violation" must be clear and unequivocal. In the clear and forcible language of Judge Story, (more strictly applicable to the state than the Federal constitution), it should be constantly borne in mind, that "the most important rule in cases of this nature is, that a constitution of government does not and cannot, from its nature, depend in any great degree upon mere verbal criticism, or upon the import of single words. Such criticism may not be wholly without use; it may sometimes illustrate or unfold the appropriate sense; but unless it stand well with the context and subject-matter, it must yield to the latter. While, then, we may well resort to the meaning of single words to assist our inquiries, we should never forget that it is an instrument of government we are to construe; and, as has been already siated, that must be the truest exposition which best harmonizes with its design, its objects, and general structure.

"The remark of Mr. Burke may, with a very slight change of phrase, be addressed as an admonition to all those who

are called upon to frame or to interpret a constitution. Government is a practical thing, made for the happiness of mankind, and not to furnish out a spectacle of uniformity to gratify the schemes of visionary politicians. The business of those who are called upon to administer it is to rule and not to wrangle. It would be a poor compensation that one had triumphed in a dispute, while we had lost an empire; that we had frittered down a power, and at the same time had destroyed the republic." 1 Story's Com., §§455, 456.

Judgment affirmed.