## SMITH *et al.* vs. BOHLER *et al.*

1. The board of education of Richmond county is one of the county authorities, and under the constitution of 1868, the legislature could grant to such board the power of taxation ror school purposes.
2. Under the title, "to regulate public instruction in the county of Richmond," an act of the legislature could grant authority to the board of education to levy a tax for school purposes, and such an act was not unconstitutional, as containing matter different from its title.
3. Nor was an act regulating public instruction, which contained a power to the county board of education to assess a tax for educational purposes, unconstitutional, as containing more than one subject-matter.
4. An assessment by taking the returns of the county tax receiver and assessing upon property as therein returned the per cent laid by the board of education, was a legitimate and fair mode of procedure and in substantial compliance with the act of 1872.
5. Where an assessment was to be made in January, or as soon thereafter as practicable, the exact time of making the assessment was a matter of judgment for the board of education; and it does not appear how the delay until August caused any injury which would require an injunction.
6. The power to fix the amount of tax necessary being vested in the board of education, a court of equity will not interfere, unless it is made very plainly to appear that the tax is excessive. It does not so appear in this case.
7. Although the board may have consisted in part of persons who were not free-holders, they were all *de facto* in office, and competent to act until ejected.
8. The tax collector's bond binds him for these as for other county taxes. If it be too small, that may be reason for legislative change, but not for injunction.
9. That the chancellor, in rendering his decision, made use of language which did not please the ear of counsel for the plaintiffs in error, is no ground for a reversal.

May 13, 1884.

Constitutional Law. Education. Richmond County. Tax. Bonds. Practice in Superior Court. Before Judge POTTLE. Richmond County. At Chambers. January 19, 1884.

This was a bill filed by certain citizens of Richmond county, alleging themselves to be tax payers, against the tax collector, sheriff, and board of education of Richmond county, to enjoin the collection of the school tax levied by the board for the year 1883.

Complainants made the following points :

(1.) That the act of 1872, organizing the board, is unconstitutional, because it contains two subject-matters, and contains matter not expressed in the title thereof.

(2.) Because the tax authorized to be levied is a personal or poll tax, and is obnoxious to article 7, section 2, paragraph 13, of the constitution of 1877.

(3.) Because the mode pointed out for levying the tax under the act of 1872, if constitutional, was not followed—complainants holding that the school commissioner should have himself taken the return and value of the property of each citizen, and upon such valuation assessed the school tax ; the fact being that the school commissioner adopted the tax return made to the state and county tax receiver for state and county taxes, and upon this valuation assessed the tax levied by the board for educational purposes.

(4.) Because the tax levied is not to provide for the expenses of a thorough system of common schools for "instruction in the elementary branches of an English education only," but is, to be used for the purchase of school houses, sites, etc.

(5.) Because the tax levied is excessive.

(6.) Because the board was illegally organized, in that certain members were not free-holders and had been illegally elected, and without the vote of such members, the two-thirds vote required under the act to levy the school tax had not been had.

(7.) Because the tax collector had no authority to issue execution for the school tax, and was without bond to collect the same.

(8.) Complainants contended in argument that the general assembly, under the constitution of 1868, had no authority to grant the power of taxation to said board.

The board alone demurred to parts of the bill, and answered, insisting on the constitutionality of the act of 1872, and upon the regularity and legality of its proceedings thereunder.

On the hearing, the bill, demurrer, answer and evidence were heard. From the evidence, the following may be abstracted as sufficient to elucidate the points decided: In 1882, the taxable property in the county, as shown on the digest, was $17,989,050; in 1883 it was $19,593,210. In 1882, the school tax was two mills on the dollar, and in 1883, two and 3-10 mills on the dollar, while the state and county tax was two and 5-10 mills each on the dollar. In 1882, the entire state and county tax was seventy-five cents on the $100.00; in 1883, it was seventy-three cents on the $100.00. $40,000.00 was to be raised by this levy of school tax, and $10,000.00 devoted to the purchase of sites, buildings, etc., through the local trustees and officials. It was also urged by complainants that, while the tax was nominally to produce $40,000.00, yet a levy of two and 3-10 mills on the property in the county digest would produce $45,064.38, besides other sources of income, so that the total income would be as follows: From local tax, $45,064.38; from state fund, $6,144.94; from former levies, from $2,000.00 to $3,000.00, say $2,500.00; from high school fees, $1,704.00; non-resident fees, $128.00; poll tax, $1,699.00; total, $57,240.32; and if the sum of $10,165.38, on hand January 1, 1883, is added, the total will be $67,405.70.

At a quarterly meeting of the board of education, held on July 14, 1883, resolutions were offered that a school tax of two and 3-10 mills be levied, and that the county

commissioner make out an assessment and return, and furnish a copy to the county tax collector. These resolutions failed for want of a proper majority. The minutes call this session a secret session, but there was some evidence tending to show that a suggestion was made that the board go into secret session; that the chairman thereupon requested the reporters to retire, and that others remained. This meeting was adjourned until July 21, when the resolutions were again put and carried. No motion for reconsideration of the former action was made.

On about August 25, 1883, after the county receiver's digest had been filed with the collector for the collection of the state and county taxes, the school commissioner went to the tax collector's office and made the following entry on the blank page in front of the digest:

"State of Georgia, Richmond county.—I hereby certify that the within and following is a true copy of the assessment and return against all the legal tax payers of Richmond county, Georgia, of the tax for public school purposes for the year 1883, made by me in pursuance of law and resolution of the board of education—the total assessment being $19,593,210, and the tax upon the same two and three-tenth mills on every dollar of property. Witness my hand and seal of said Richmond county board of education, this the twenty-fifth day of August, 1883. (Signed) L. B Evans, Secretary of the Board of Education and County Commissioner."

At the same time, the commissioner handed to the tax collector a paper, of which the following is a copy:

"Augusta, Georgia, August 27, 1883—John A Bohler, Tax Collector Richmond county, Georgia: I hereby certify at a meeting of the Richmond county board of education, legally held on the twenty-first (21st) day of July, 1883, it was voted, in accordance with the law, two-thirds of the members concurring therein, that the sum of forty thousand ($40,000) dollars be raised in said county of Richmond for public school purposes for the year 1883, and that a tax sufficient to realize the same be levied, the said tax being two and three-tenth mills on every dollar of taxable property of the legal tax payers of the county. In obedience to the order of said board, and in pursuance of law, I do hereby assess and return a tax against all the legal tax payers in the county of two and three-tenth mills upon every dollar of taxable propery held by legal tax payers in said county, in pursuance of the law entitled 'An act to regulate public instruction

in the county of Richmond,' approved August 23, 1872. And I hereby place in your hands a copy of my assessment and return of said tax against all the legal tax payers in said county of Richmond, made out in pursuance of law. You are hereby directed to collect said tax and deposit it to the credit of the Richmond county board of education, in such bank in the city of Augusta as may be designated by the state commissioner for the deposit of the county school fund. In witness whereof I have hereunto set my official hand and affixed the seal of said board, this 27th day of August, 1883.

(Signed): Lawton B. Evans, Secretary Board of Education and County School Commissioner. [Seal.]"

A like certificate was placed at the end of the copy digest in the ordinary's office as in that of the tax collectors. There was no entry on the tax digest in reference to a levy of tax by the board of education, until the one above stated, and the tax receiver testified that, in making up the digest, he did so without reference to the assessment of a school tax. After this entry and notice by the school commissioner, the tax collector made a pencil memorandum opposite the name of each person of the sum which two and 3-10 mills would make upon the property owned by each, and when the tax was paid, with the state and county tax, the collector carried the amount, in ink, to the total or paid column.

Several members of the board of education returned no property for taxation, and seven members who voted for the tax imposed were elected by the board to fill vacancies caused by failure to hold an election at the expiration of the terms of former incumbents.

Defendants introduced evidence to the effect that the school system was the same as operated prior to the adoption of the constitution of 1877, and the increase in cost was due to increase in the number of children in attendance and the necessity of preparing for their accommodation. The tax collector and city judge testify that the margin of $5,064.38 on a tax levy to produce $40,000, was a just and proper allowance to cover insolvents, errors in digest, and collector's commissions. The tax collector further said: " That the entire amount the board can ex-

pect to receive from former tax levies will not exceed. two thousand to three thousand dollars; that all unpaid taxes on said levies are in execution, and deponent believes a. large part of the same are held back under affidavit of illegality." Each of the members of the board who voted to levy this tax had taken the oath of office before the ordinary, and received from him a commission signed by the governor.

Other points were made, to the effect that the funds were not to be used for elementary or common school education alone, but in schools in which a higher curriculum was adopted, the purchase of sites for schools other than high schools, etc., but these are not material to an understanding of the decision.

The chancellor filed a written decision, reviewing the case and refusing an injunction. Complainants excepted and made twenty-five assignments of error, the material points of which may be seen from the facts stated above. One assignment was as follows:

Because the court erred in inserting in his decision, as follows: "Prior to the late war we had no educational system, except one which degraded the children of the poor. A convulsion came. The fountains of the great deep of our civilization were broken up, millions of estates and securities were swept away, and at its close the children of the rich were leveled with the untold thousands of the poor. The children of the Confederate soldier were thrown upon us, and this vast array of a juvenile population became, at the boom of the last cannon, the wards of the state and the wards of humanity. Superadded to this, an immense population of the children of our former slaves were thrown upon us without culture and without the means of acquiring it. * * * If I am right, I shall have the satisfaction of knowing that no door will be shut to those who, invited by the state, stand and knock for something more valuable than earthly treasures."—The objection was that this was not relevant to any of the issues raised by the pleadings or facts in said case.

FRANK H. MILLER; FOSTER & LAMAR, for plaintiffs in error.

J. S. & W. T. DAVIDSON; JOS. GANAHL; C. Z. Mc-CORD; JAS. P. VERDERY, for defendants.

JACKSON, Chief Justice.

A number of tax-payers of Richmond county brought their bill in equity against the board of education of that county, the tax collector and sheriff thereof, to enjoin the levy of a tax authorized and assessed by the board of education, and on the refusal of the injunction prayed for, by the chancellor, they excepted, and assign for error here that refusal.

1. The board of education was incorporated and organized by an act passed by the general assembly of 1872, on the 23d of August of that year. See acts of 1872, p. 456. The title of the act is "An Act to regulate public instruction in the county of Richmond." By the 16th section thereof, this board was authorized to "levy such tax as they may deem necessary for public school purposes;" and the first point made by the plaintiffs in error is, that the general assembly had no authority to confer the taxing power upon this board. The general assembly of that year were acting under the constitution of 1868, then of force. By that constitution, Art. 1, Section 28, "the general assembly may grant the power of taxation to the county authorities or municipal corporations, to be exercised within their several territorial limits." Therefore, if the board of education be one of the county authorities of Richmond county, the legislature of 1872, acting under the constitution of 1868, did have the constitutional authority or power to grant to this board the power to tax for this purpose.

Was it a county authority? We think it one of the most important of all the authorities of that county. Education is the corner-stone of a political fabric, especially

where that fabric rests on the basis of popular suffrage. Neither roads, court houses nor district subdivisions, or other arrangements for good government, are more vital to society. To regulate the instruction of the children, who are soon to become the fathers and mothers of the land, is a great public trust, second to none, confided to the people's agents, and those clothed with power to perform such a work in a county constitute a great county authority, the very head of the list of the fiduciary agents of that county which confides such a trust to them.

The inferior court used to be clothed with the power to levy county taxes; then the ordinaries possessed it; then commissioners of roads and revenues exercised it. Some required the recommendation of grand juries, but all these were county authorities. May not county authorities consist of a different set of officers for different objects? Why not? The very fact that the plural—authorities—is used, shows that the general assembly were authorized to organize more than one man, or set of men if they chose, for the business of the county, and thus make a division of trusts and of labor. We think, therefore, that this board of education is as much a county authority in Richmond county as are the commissioners of roads and revenues, or the judge of the county court, or ordinary, or any other officer or set of agents entrusted with other branches of the public service in that county. The framers of the constitution of 1868 had at heart the great matter of general education, and entrusted the general assembly with ample power over the entire subject and the power, among others, to provide therefor by taxation. Art. VI.

2. Is the title, "To regulate public instruction in the county of Richmond," broad enough to embrace the power to tax? The teachers must be provided; children cannot be taught without them. To procure their services requires money. To raise the money necessitates the power to reach the pockets of the people. That power is nothing more nor less than the power to tax. So that, to regulate

the great interest of public instruction involves and embraces the power to tax. The superintendent of the entire system is its practical regulator. He must be paid. Discipline, government in each school-room, must be confided to some subordinate to regulate the behavior of the children; and hence there must be a teacher in each school or school-room, otherwise it will be all play and no study, and nothing will be regulated for the sole object of the system, to-wit: " public instruction in the county of Richmond." To procure these head-regulators of each school, money must be had, and it is sheer nonsense to attempt the regulation without the money to pay the practical regulators. To furnish school-houses and rooms, money is equally essential, for these must be rented or leased, or bought or built; children cannot be taught, or regulated while taught, without places in which to house them. Whence is the money to be got for these necessary purposes of education, if not by taxation? We are clear, therefore, that the foundation on which the power to regulate public instruction rests, to-wit, teachers and school-houses, is money. It is the only means to the end. Without it the wheels all stop, and the factory, which makes men and women sufficiently strong in texture not to rot out and ruin the political fabric, sooner or later must suspend work in Richmond county; and the board of education will become wholly impotent to regulate public instruction, because there will be none for them to regulate.

3. It follows, from these considerations, that there are not two subject-matters in the act. If it be necessary to have money to regulate public instruction, then the mode of getting the money wherewith to regulate it is of the very essence of the power to regulate. It is more than germane to it. It is its life-blood, the most important part of its own physique; that which alone keeps it alive, without which neither foot nor hand nor head nor tongue could perform its function.

Therefore, the subject-matter of raising the money is

not a subject-matter, in the sense of the constitution, different from the subject-matter of the regulation of public instruction, and there are not two subject-matters in the act of 1872. *Hope et al. vs. Mayor and Council of Gainesville,* this term.

4. The mode of assessment was a substantial compliance with the 16th section of the act of 1872. It was based on the returns of the tax receiver of the county, and it assessed on property, as therein returned, the per cent laid by the board. It seems to have been a legitimate and fair mode of making out, with least expense to the tax-payers, an assessment and return of the tax which the action of the board, in fixing the per cent, authorized. It seems strange that equity should be invoked to enjoin the collection of the tax at the suit of tax-payers, when the mode adopted followed that used by the state, was based upon it, and thus saved the expense of paying for services equal to those of a tax receiver. The county commissioner could hardly pursue any other course and discharge the other duties devolving upon him, and this is another reason why we think the mode pursued by him, or some such mode, was that contemplated by the act of 1872.

5. The time of the assessment—August, 1883—is objected to, on the ground that it was not the month of January, "or as soon thereafter as practicable." That is matter for the judgment of the board of education, and we do not see from the record how the delay hurt anybody so badly as to require the strong arm of an injunction to furnish a remedy for the wound. Perhaps the board waited to see what the taxable property of Richmond county would be in all, in order to lay such a per cent as would pay the expenses of education. If so, it was a capital good reason, and tax-payers should not complain, inasmuch as their interest was to have the per cent as little as possible.

6. So in regard to the charge that the tax is excessive; the power to fix the amount necessary is vested in the board. A court of equity would not interfere, unless it

was made very plain that the tax was excessive. The facts disclosed in this record do not make such a case.

7. It is objected, too, that the board consisted, in part, of persons not free-holders, but they were all *de facto* in office, and competent to act until ejected. 63 *Ga.*, 207, 527; 20 *Id.*, 746 ; Code, §129 , *et seq.*, 3764.

8. The tax collector's bond binds him for this, as for other county taxes. Its small amount surely will not authorize tax-payers to refuse to pay county taxes. Let them send members to the legislature who will have it increased.

9. Surely the exception that Judge Pottle, in his very able and learned opinion, used language which did not please the ear of counsel for the plaintiffs in error, was not seriously made one of the exceptions to his judgment, and urged as a reason to reverse it.

The questions relied on with propriety by the able and learned counsel for plaintiffs in error, are the constitutional points first considered. The others, we suppose, were hurriedly thrown in, many of them, as ballast or make-weight. On those constitutional questions, it may be well to add that, so far as general provisions of the constitution of 1877 may be argued to affect the system of education in Richmond county, that constitution itself provides a complete answer. The first paragraph of the fifth section of the eighth article of that constitution declares: "Existing local school systems shall not be affected by this constitution." Code, §5208.

Judgment affirmed.

See cited for plaintiffs in error: 4 *Ga.*, 38 ; 30 *Id.*, 679 ; 49 *Id.*, 238 ; 12 *Id.*, 36 ; 59 *Id.*, 364 ; 29 *Id.*, 158 ; 51 *Id* , 573 ; 52 Mo., 20 ; Cooley, 577–8 ; 12 Barb., 559 ; 15 Mich., 54 ; 9 Wheat., 196 ; 8 Heisk., 857 ; 1 Lea, 546 ; 2 Met., 350 ; 51 Ill., 130 ; 33 N. H., 424 ; Potter's Dwarris, 420, 337 ; Cooley Tax, 52 n ; 2 Dillon Mun. Corp., 746 ; Burroughs, 74, 76 ; Suppl., 2–7 ; Field on Corp., 295; *The State vs. McLain*, 71 *Ga.*, 279 ; R. M. C. R., 26 ; 96 U.

S., 104; 60 *Ga.*, 138; 64 *Id.*, 286, 498; 67 *Id.*, 293; 27 *Id.*, 354; Cooly on Tax, 210; 3 Greenleaf (Me.), 191; 18 Q., 161; 12 Barb., 559; Cooly's Con. Lim., 195, note 2; 27 Pa. St., 339; 19 *Id.*, 324; 16 Mich., 12; 20 Wal., 655; 3 *Id.*, 664; 40 Cal., 225; 4 Wheat., 30; 100 U. S., 545; 104 *Id.*, 613; 74 N. C., 707· 72 *Id.*, 10; 52 Mo., 336; 30 Ala., 461

For defendant: 9 *Ga.*, 253; 43 *Id.*, 554; 54 *Id.*, 664; 66 *Id.*, 226; *Wellborn vs. Estes,* 70 *Ga.*, 390; 7 *Ga.*, 460; 9 *Id.*, 142, 592, 252; 8 *Id.*, 316; 44 *Id.*, 78; *Howell vs. State,* 71 *Ga.*, 224; 58 *Id.*, 512; 33 *Id.*, 332; 52 *Id.*, 223; 63 *Id.*, 207; 20 *Id.*, 746; 44 *Id.*, 454; 41 *Id.*, 331; 63 *Id.*, 527; *Churchill vs. Walker,* 68 *Ga.*, 681; *McLain vs. State,* 71 *Ga.*, 279; 63 *Ga.*, 736; 49 *Id.*, 232; 57 *Id.*, 370; Code 129 *et seq.*, 69, 147, 3203, 934, 886; Code of 1873, §§5062, 5112; 1 Am. R., 399; 8 *Id.*, 602; 9 *Id.*, 578; 37 *Id.*, 456; 34 *Id.*, 151, 737; 46 *Id.*, 100, 456; 25 *Id.*, 235; 37 *Id.*, 454, 564; 30 *Id.*, 168, 246, 548; 29 *Id.*, 212, 267; 10 *Id.*, 35; 6 Am. D., 62; 19 *Id.*, 63; 32 *Id.*, 243; 21 *Id*, 199, 213; 8 Wheat., 570; 104 U. S., 604; 4 Wheat., 316, 518; 9 Wall., 1; Acts of 1877, p. 347; of 1870, p. 57; of 1874, p. 109; of 1871–2, pp. 13 and 279; of 1873, p. 64; of 1878–9, p. 20; of 1874, pp. 30, 101; of 1880–1, pp. 36, 40; of 1872    462; 2 Dillon Mun. Corp.. 745, 747.